In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 13-3010, 13-3776

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION
FUND and ARTHUR H. BUNTE, JR., TRUSTEE,

*Plaintiffs-Appellees,*

*v.*

CLP VENTURE LLC, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 3785 — **Ronald A. Guzmán**, *Judge.*

ARGUED JUNE 4, 2014 — DECIDED JULY 29, 2014

Before WOOD, *Chief Judge*, and CUDAHY and ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. This case arises under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA); we must determine primarily whether or not the various co-defendants were under common control, and therefore are jointly and severally liable for the withdrawal liability indisputably incurred by General Warehouse, Inc.. Because there

is overwhelming evidence that these entities were under common control, we now affirm.

This appeal originated with General Warehouse, which as an employer was obligated to contribute to the Central States Pension Fund (the Fund) on behalf of certain employees. In 2005 it ceased to have an obligation to the fund, which led to a complete withdrawal, incurring withdrawal liability in the amount of $1,262,568. The Fund filed suit to collect from General Warehouse, as well as GEOBEO and other businesses under common control. The parties to that litigation entered into a consent judgment, acknowledging that the named defendants were jointly and severally liable. The Fund then initiated this action to add the defendants to the group of business entities from which it can collect.

The only other pertinent facts in this case pertain to George Cibula's ownership of GEOBEO, and the rather convoluted Stock Redemption Agreement that resulted in his acquiring the right to acquire at least 80% of GEOBEO shares. In 1997, Cibula owned 65% (650 shares) of GEOBEO, while Robert Pieranunzi owned the remaining 35% (350 shares). That same year, they entered into a Stock Redemption Agreement through which GEOBEO[1] would buy back Pieranunzi's stock. Pieranunzi surrendered his shares and new stock certificates were issued to an escrowee. The escrowee was to hold the stock certificates in escrow and release them as installment payment were made according to the Stock Redemption Agreement. GEOBEO made the first

---

[1] According to the regulations relating to MPPAA liability, because Cibula owned at least 50% of GEOBEO, GEOBEO was under his "effective control." 26 C.F.R. § 1.414(c)-2(c)(2).

of several payments, and accordingly 112 shares were released from escrow, giving Cibula 73% of GEOBEO's total shares. GEOBEO defaulted on the Stock Redemption Agreement, and the untransferred shares remained in escrow. To resolve his liability under the Stock Redemption Agreement, Cibula entered into an Assignment Agreement with Pieranunzi, under which Cibula gained the right to direct the voting shares while in escrow or direct a distribution of the shares to himself. At all relevant times, the remaining 27% of GEOBEO shares were in escrow. Pursuant to the Assignment, voting control of the escrow was vested in Cibula.

The district court granted summary judgment in favor of the Fund and struck the defendants' jury demand. The defendants now appeal the district court's finding that Cibula had a controlling interest in GEOBEO, the characterization of the defendants as "trades" or "businesses" and the order striking their jury demand. While a grant of summary judgment is typically reviewed *de novo*, because the only issue before the district court was the characterization of undisputed subsidiary facts, we review for clear error. *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP*, 668 F.3d 873 (7th Cir. 2011). We review the order striking the jury demand *de novo*.

## I.

Under 29 U.S.C. § 1301(b)(1), if a withdrawing employer is unable to pay in full, a pension plan can recover the deficiency jointly and severally from any other trade or business under common control with the withdrawing employer. *See Central States, Se. & Sw. Areas Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir. 1992).

There are a few pieces to this analysis; however, the only real question before us is whether the district court properly concluded that Cibula had a controlling interest in GEOBEO. If Cibula did in fact have a controlling interest in GEOBEO, then the defendants are part of a combined group[2] under Cibula's common control and are jointly and severally liable for General Warehouse's withdrawal liability.

In this context, a controlling interest is defined as having ownership of stock representing at least 80% of voting power of all classes[3] of stock or 80% of the total value of all shares. 26 C.F.R. § 1.414(c)-2(b)(2)(i)(A). The district court determined that Cibula had a controlling interest because he acquired all of Pieranunzi's interest in GEOBEO stock (including that in escrow), including both the right to demand the release of the stock from escrow and the right to vote 100%

---

[2] Under the regulations defining common control, there are three different common control categories relevant to this case. First is a "parent-subsidiary" group, where one or more organization is connected through a common parent. The parties to the General Warehouse litigation are a parent-subsidiary group (General Warehouse Group), of which GEOBEO is the parent. Second is a "brother-sister" group, where five or fewer individuals own a controlling interest and effectively control two or more organizations. All of the Appellants here are a brother-sister group, with Cibula owning at least 80% (Cibula Group). The final category is a "combined group" which is defined as a group of three or more organizations where each organization is a member of a parent-subsidiary or brother-sister group and at least one of the organizations is the common parent of the parent-subsidiary group AND a member of the brother-sister group. GEOBEO is both the parent organization (if Cibula owns 80% of the stock) in the parent-subsidiary group and a member of the brother-sister group. *See* 26 C.F.R. §§ 1.414(c)-2(b)(1); 2(c)(1); 2(d).

[3] GEOBEO had only one class of shares, all of which were voting shares.

of the stock in escrow before the date of General Warehouse's withdrawal. We agree with the district court that Cibula had a controlling interest.

Paragraphs four and five of the Assignment Agreement make Cibula's interest in the shares abundantly clear. Those paragraphs provide that Pieranunzi transfers to Cibula all rights he had in the shares created by the Stock Redemption Agreement, "including the right to demand a transfer from GEOBEO to Assignee of Assignor's Shares in the event of a default under the Note." The Agreement also provides that Pieranunzi "relinquishes, waives and releases and rights which Assignor may have under the Stock Redemption Agreement." Thus, under the clear terms of the agreement, Cibula can elect to demand the transfer of the shares to himself.

The defendants contend that despite having the right to demand the release of the escrowed shares to himself, Cibula never exercised that right. What the defendants misunderstand is that the regulations concerning common control for purposes of the MPPAA provide that "if a person has an option to acquire any outstanding interest in an organization, such interest shall be considered as owned by such a person." 26 C.F.R. § 1.414(c)-4(b)(1). Thus, because Cibula gained the right to acquire the stock under the assignment, he is considered to own that stock for purposes of the MPPAA.

The defendants also contend that Pieranunzi retained the right to reclaim the shares in the event of default, and therefore Cibula did not control the shares in escrow. They rely on

paragraph six of the Assignment Agreement[4], which states that Pieranunzi retains any legal remedies available to him in the event of a default. The defendants contend that his legal remedies include the right to reclaim his shares. Thus, they argue that if Pieranunzi has a right to reclaim, then he never relinquished control of those shares, which would limit Cibula's control of GEOBEO to less than 80%. However, the defendants ignore the fact that in the paragraphs immediately preceding paragraph six Pieranunzi explicitly assigned to Cibula the right to demand the shares in escrow.[5] It is inconsistent then to construe the broad language of paragraph six to include a right that was explicitly surrendered in the preceding paragraph. Therefore, the defendants' reliance on paragraph six is misplaced.

In addition to having the right to direct the shares to himself, Cibula had 100% voting control of GEOBEO. Pursuant to the terms of the Stock Redemption Agreement while

---

[4] Paragraph six states: "In the event the Assignee [Cibula] fails to timely make any of the payments … under the Assignment … Assignor [Pieranunzi] shall have the right to declare the total remaining balance immediately due and payable and to pursue any and all legal remedies which Assignor may have against Assignee."

[5] Specifically, paragraph four of the Assignment Agreement transferred from Pieranunzi to Cibula the right to demand the shares in escrow in the event that GEOBEO defaulted under the Stock Redemption Agreement. Because GEOBEO was in default at the time of the Assignment Agreement, Pieranunzi transferred the right to reclaim his shares at the time of the Assignment Agreement. The relevant portions of paragraph four read: "Assignor [Pieranunzi] does hereby transfer and assign to Assignee[Cibula] all rights Assignor has or holds … including the right to demand a transfer from GEOBEO to Assignee of Assignor's Shares [in escrow] in the event of a default under the Note."

GEOBEO was in default the escrowee was required to abstain from voting the stock in escrow. This effectively meant that the stock owned by Cibula (that which remained outside of escrow) was the only stock entitled to vote, giving Cibula 100% of the voting power whether or not he owned the stock in escrow. The defendants would have us believe that because the escrowee voted he had voting control over the stock in escrow, regardless of the fact that he voted to abstain as he was required to. We are concerned with who had voting power, thus the fact that the escrowee technically voted is irrelevant because he was bound by the Stock Redemption Agreement to abstain. *See* 26 C.F.R. § 1.414(c)-4(b)(2)(i)(A).

Accordingly, we agree with the district court that before the date General Warehouse incurred withdrawal liability, Cibula had a controlling interest in GEOBEO. As a result, the defendants were properly characterized as being part of a "combined group" under common control, making them jointly and severally liable for General Warehouse's withdrawal liability.

## II.

We now turn to consider whether the defendants can be characterized as "trades" or "businesses" under the MPPAA. *See* 29 U.S.C. § 1301(b)(1). The defendants are all formally organized business entities. Two of the defendants are corporations and the remaining are for-profit limited liability corporations. The defendants are engaged in various for-profit enterprises, from property management to commercial equipment leasing.

The defendants argue that Cibula spent so little time personally involved with these businesses, that they are more correctly characterized as passive investments, rather than trades or businesses. We disagree. There is no real question as to whether these formally registered business entities are aptly construed as such for purposes of withdrawal liability under the MPPAA. However strained the defendants' contention is in this regard, the district court still properly applied the relevant test from *Groetzinger* and determined that the defendants were indeed trades or businesses under the MPPAA. Under the test the court considers whether the person was engaged in the activity (1) for the primary purpose of income or profit; and (2) with continuity and regularity. *Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987). More specifically, when applying this test courts look to factors such as the purpose, tax status, and legal form of the enterprise. *See, e.g.*, *Personnel*, 974 F.2d at 795; *Connors v. Incoal, Inc.*, 995 F.2d 945, 954 (D.C. Cir. 1993). The point of this test is to distinguish trades and businesses from investments, "which are not trades and businesses and thus cannot form a basis for imputing withdrawal liability." *Personnel*, 974 F.2d at 794.

We have previously held that formally recognized business organizations pose "no interpretative difficulties" for the *Groetzinger* test. *Central States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001). We have also noted that because "formal business organizations ordinarily operate with continuity and regularity and are ordinarily formed for the primary purpose of income or profit, it seems highly unlikely that a formal for-profit business organization would not qualify as a "trade or business."

*SCOFBP*, 668 F.3d at 878. The defendants here pose no contradictions to these qualifications.

In mounting their challenge to the district court's characterization of them as trades or businesses, the defendants rely heavily on the fact that Cibula spent very little time—less than ten hours per year—personally managing these businesses. Viewed in isolation, Cibula's minimal involvement might be persuasive, but defendants ignore other, more persuasive factors, which undercut their argument that these were mere passive investments.

In 2005, the defendants paid a combined total of over $250,000 to companies who managed and operated the various business entities. Thus, the argument that Cibula was not involved in these entities is a red herring, since these significant management fees obviated the need for Cibula's personal involvement. In fact, the management fees indicate that the activities undertaken by the defendants were continuous and regular. *See, e.g.*, *SCOFPB*, 668 F.3d at 879. In addition to the management fees paid, the defendants also claimed business-related income deductions on their federal income tax returns; they applied for and were issued Federal Employer Identification Numbers; and they contracted with professionals to provide legal, managerial, and accounting services. All factors indicate that the defendants were properly characterized as businesses or trades. *Id.* at 878.

## III.

The defendants also contend the district court improperly struck their jury demand. They are wrong. We have previously held that there is no right to a jury trial in an MPPAA withdrawal liability action—no provision in the MPPAA or

the Seventh Amendment provides for one. *McDougall v. Pioneer Ranch Ltd.*, 494 F.3d 571, 576 (7th Cir. 2007). *McDougall* presented the same type of claim as is made in this case, thus the Appellants' attempt to distinguish it is unavailing. In any event, even if the court did commit error in striking the jury demand, it would not be grounds for reversal—the court did not hold a bench trial, but resolved the matter on summary judgment. The defendants cannot avoid summary judgment by challenging this form of disposition when no trial was necessary.

AFFIRMED.