FILED
United States Court of Appeals
Tenth Circuit

May 3, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CECO CONCRETE CONSTRUCTION,
LLC,

      Plaintiff Counter Defendant -
      Appellee/Cross-Appellant,

v.

CENTENNIAL STATE CARPENTERS
PENSION TRUST,

      Defendant Counterclaimant -
      Appellant/Cross-Appellee,

and

BOARD OF TRUSTEES OF THE
CENTENNIAL STATE CARPENTERS
PENSION TRUST,

      Counterclaimant -
      Appellant/Cross-Appellee.

Nos. 15-1021, 15-1190

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:13-CV-01749-RBJ)**

Michael P. Monaco, Song Mondress PLLC, Seattle, Washington, appearing for
Appellants/Cross-Appellees.

Richard L. Samson, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Chicago, Illinois, appearing for Appellee/Cross-Appellant.

Before **KELLY, MATHESON,** and **MORITZ,** Circuit Judges.

**MATHESON**, Circuit Judge.

This appeal concerns whether a construction company that stopped contributing to its employees' pension plan must pay withdrawal liability under the Multiemployer Pension Plan Amendment Act ("MPPAA"). Ceco Concrete Construction, LLC ("Ceco") was a party to a collective bargaining agreement ("CBA") that required it to contribute to the Centennial State Carpenters Pension Trust ("Trust"), a multiemployer pension plan. After Ceco stopped contributing, the Trust assessed MPPAA withdrawal liability, which is a payment that withdrawing employers must make to pension plans.

Ceco disputed the withdrawal liability and initiated arbitration. The arbitrator sided with Ceco, concluding withdrawal liability was improper. Ceco then sued in federal district court to affirm the arbitrator's decision. The Trust and its Board of Trustees (jointly, "the Plan") counterclaimed, asking the district court to vacate the arbitrator's award. The district court granted summary judgment in Ceco's favor, granted Ceco's request for costs, and denied Ceco's request for attorney fees.

The Plan appealed the grant of summary judgment; Ceco appealed the denial of attorney fees. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district

court's grant of summary judgment and remand with instructions to vacate the award of costs to Ceco.

## I.  BACKGROUND

### A. *Statutory and Federal Common Law Background*

The Plan argues withdrawal liability is warranted based on (1) 29 U.S.C. § 1383(b), an MPPAA provision governing withdrawal liability, and (2) the single-employer and alter ego doctrines under federal common law.  We describe the relevant statutory provisions and federal common law in turn.

### 1.  **The MPPAA**

#### a.  *The MPPAA's enactment*

The Employee Retirement Income Security Act of 1974 ("ERISA") regulates private pension plans.  *Connolly v. PBGC*, 475 U.S. 211, 214 (1986).  The statute "ensure[s] that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans."  *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984).  ERISA created the Pension Benefit Guarantee Corporation ("PBGC"), a government corporation that insures covered employees against fund insolvency and premature termination. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 607 (1993).

ERISA's broad reach includes regulation of multiemployer pension plans that receive contributions from two or more employers.  Shortly after ERISA's enactment, the

PBGC reported to Congress that employers had an incentive to withdraw from financially weak multiemployer plans to avoid paying for any shortfalls if the plan ended. *Id.* at 608. Employer withdrawals diminished a plan's contribution base, which increased the contribution rate for remaining contributing employers. *See R.A. Gray*, 467 U.S. at 722 n.2. If a plan terminated with insufficient funding, the remaining contributing employers were left to pay for the shortfall. *See id.*

To ameliorate this problem, Congress passed the MPPAA, an amendment to ERISA codified at 29 U.S.C. §§ 1381-1461. The MPPAA imposes "withdrawal liability" on an "employer" that has an "obligation to contribute" to a plan but withdraws from the plan. *See* 29 U.S.C. § 1381(a) (describing "withdrawal liability"); 29 U.S.C. § 1392 (defining "obligation to contribute").

In this case, the obligation to contribute arises out of Ceco's CBA with the carpenters' union. *See* 29 U.S.C. § 1392 (stating an obligation to contribute arises out of a CBA). Withdrawal liability is a required payment a withdrawing employer must make that "is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *R.A. Gray*, 467 U.S. at 725 (quoting 29 U.S.C. § 1391). Withdrawal liability discourages withdrawal and compensates pension plans when it occurs.

b. *"Employer" in the MPPAA*

The term "employer" is used throughout the MPPAA, including in § 1383.

Defined in 29 U.S.C. § 1301(b)(1), an "employer" means "trades or businesses" under "common control" (i.e., a common-control group). "[A]ll businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 86 (2d Cir. 1997). "Employer" is synonymous with common-control group.

    c. *Construction-industry complete withdrawal under 29 U.S.C. § 1383(b)(2)*

An employer (i.e., a common-control group) incurs liability if it withdraws from a pension plan. 29 U.S.C. § 1381(a). The statute defines different types of withdrawals. For most employers, § 1383(a) provides that a "complete withdrawal" occurs when one of them "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." For construction employers, § 1383(b)(2) provides a narrower definition of "complete withdrawal": when (1) "an employer ceases to have an obligation to contribute under the plan," and (2) either (a) "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" or (b) "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption."[1]

_____

[1] We note the technical use of the term "withdrawal" in § 1383(b)(2). Generally speaking, "withdrawal" connotes the act of removing or retracting rather than continuing or resuming. For purposes of § 1383(b)(2), however, "withdrawal" occurs when a

Continued . . .

In other words, § 1383(a) withdrawal liability arises when the employer stops its duty to contribute or ceases covered operations, but a construction employer has to do more to incur liability under § 1383(b)(2) after halting its contribution obligation. It must also continue covered operations or resume them within five years to be liable. In short, construction employers are treated more generously than most other employers under the MPPAA.

This generous treatment under § 1383(b)(2) accounts for the temporary nature of construction projects and allows construction employers to stop contributing to pension plans in certain circumstances without incurring withdrawal liability. *See Carpenters Pension Trust Fund for N. Cal. v. Underground Const. Co.*, 31 F.3d 776, 778 (9th Cir. 1994) ("[I]n enacting the MPPAA Congress recognized the transitory nature of contracts and employment in the building and construction industry with a specific exception.").

    d.  *Calculation of withdrawal liability*

Section 1391 instructs a plan to calculate the amount of liability based on the employer's contributions as of the last day of the calendar year that preceded the date of complete withdrawal. *See* 29 U.S.C. §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(3)(A), (c)(4)(A); *see also Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 418-19 (1995). Section 1383(e) defines "date of complete

_____

Cont.

common-control group continues or resumes covered work after having ceased to contribute to the pension plan.

withdrawal" as "the date of the cessation of the obligation to contribute or the cessation

of covered operations."  The "date of complete withdrawal" under § 1383(e) is therefore

the starting point for calculating liability.

2.  **The Single-Employer Doctrine Under Federal Labor Law**

In addition to the statutory definition of "employer" to mean a common-control

group, courts may also treat separate entities as a single employer under two tests

developed through federal common law:  the single-employer test and the alter ego test.

These tests are a product of National Labor Relations Board adjudicative decisions and

federal common law—they are distinct from the § 1301(b)(1) common-control analysis

and § 1383(b)(2) withdrawal liability.[2]

The single-employer test consists of four factors:  "(1) interrelation of operations;

(2) centralized control over labor relations; (3) common management; and (4) common

ownership or financial control.  All four factors, however, are not necessary for single-

---

[2] *See Radio & Television Broadcast Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (citing the 1956 annual report of the National Labor Relations Board for a test that "considers several nominally separate business entities to be a single employer where they comprise an integrated enterprise"); Nat'l Labor Relations Bd., Twenty-First Annual Report 14-15 (1956) (citing adjudicative decisions applying what came to be known as the single-employer test); *Venus Die Eng'g Co.*, 110 N.L.R.B. 336 (1954) (considering two related entities as a single employer); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998) (stating the single-employer test was "promulgated by the National Labor Relations Board" (quotations omitted)); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089 (10th Cir. 1991) (same); *United Steelworkers of America v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir. 1988) ("[W]e recognize that we are required to apply a body of federal common law that has developed in connection with section 301 [of the Labor Management Relations Act] in cases seeking to invoke the alter ego principle.").

employer status. Rather, the heart of the inquiry is whether there is an absence of an arm's-length relationship among the companies." *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999) (citation omitted).

The alter ego test focuses on whether there is "a disguised continuance of the same business or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 518 (9th Cir. 1989); *see also Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union*, 417 U.S. 249, 261 n.5 (1974) (stating an "alter ego . . . is merely a disguised continuance of the old employer" (quotations omitted)).

## B. *Factual History*

### 1. **The Parties**

The Plan is a multiemployer pension plan that covers union employees in the building and construction industry, particularly carpenters in Colorado.

Ceco is a national construction company that erects concrete forms. It participated in the Plan as a signatory to a CBA with the carpenters' union in Colorado until May 1, 2010.

Heico Holdings, Inc. has owned Ceco since 1995. At the time of the arbitration, Heico owned over 40 companies, nine of which were part of the Heico Construction Group.

CFA is a construction company in Colorado that Heico acquired on October 1, 2010. CFA performs the same type of construction work as Ceco; the two companies were direct competitors in the Colorado market from 1991 until the October 2010 acquisition. As a nonunion company, CFA does not participate in a CBA or contribute to a pension plan.

2. **Ceco's Termination of Its Obligation to Contribute to the Plan**

In 2008, Ceco began experiencing a significant downturn in work. The company eventually could not afford to bid for projects against nonunion competitors that did not pay into pension plans.

Ceco's CBA with the carpenters' union expired on April 30, 2010. The company decided to not renew its CBA and to convert to a nonunion company. Ceco's obligation to contribute therefore ceased on May 1, 2010. The parties stipulate that Ceco and Heico were under common control on May 1, 2010 and that CFA was not under common control with Ceco and Heico at that time.

3. **Heico's Acquisition of CFA**

Heico purchased CFA on October 1, 2010, and through CFA expanded its construction work in Colorado, performing the same type of work that Ceco did but in greater volume. Heico eventually closed Ceco's Denver office. The parties stipulate that CFA, Ceco, and Heico have been under "common control" since the acquisition.

4. **Withdrawal Liability**

On March 3, 2011, the Plan assessed withdrawal liability of $917,904 against

Ceco, with the option of paying $39,697 in quarterly installments. Ceco timely disputed the withdrawal liability in accordance with MPPAA dispute-resolution provisions in 29 U.S.C. §§ 1399 and 1401. Leading up to the arbitration, Ceco made nine quarterly payments totaling $348,273.[3]

## C. *Procedural History*

### 1. **Arbitration**

Ceco initiated arbitration under § 1401(a), which requires MPPAA disputes between an employer and a plan to be resolved through arbitration. In the Plan's Answering Statement, it asserted Ceco and CFA were under common control and the work of CFA's employees in Colorado should be attributed to Ceco for purposes of MPPAA withdrawal liability. In other words, the Plan contended CFA's work constituted a resumption of covered work that caused a § 1383(b)(2) withdrawal.

The parties submitted the following issues to the arbitrator: (1) whether withdrawal liability existed under § 1383(b)(2) and (2) whether Ceco and CFA were a single employer or alter egos under federal common law.[4]

---

[3] Under 29 U.S.C. § 1401(d), an employer that has been assessed withdrawal liability must make payments while arbitration is pending.

[4] The parties also submitted to the arbitrator the question whether Heico's acquisition of CFA was intended to evade or avoid withdrawal liability under § 1392(c). This issue was not raised in this appeal. The arbitrator concluded there was no evidence that Heico engaged in a transaction with a principal purpose of evading or avoiding liability. The district court agreed. *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Trust* (*Ceco I*), 75 F. Supp. 3d 1328, 1330, 1340-42 (D. Colo. 2014).

The arbitrator decided the first issue on June 23, 2012, when it issued an Interim Award. The Interim Award stated withdrawal liability can be assessed only against entities that are under common control on the date the obligation to contribute to the plan ceases. It thus concluded the Plan could not assess withdrawal liability because CFA was not under common control with Heico and Ceco when Ceco's obligation ceased on May 1, 2010.

The arbitrator decided the second issue on June 7, 2013, when it issued the Final Award and Opinion. The Final Award and Opinion stated the single-employer and alter ego "questions can [both] be answered by examining the facts in light of the tests used to determine 'single employer.'" Aplt. App. at 243. It concluded Ceco and CFA were not a single employer or alter ego because they had separate management, operations, and control of labor relations.

The arbitrator ordered the Plan to refund all withdrawal liability payments to Ceco in a lump sum of $348,273, plus interest.

2. **District Court**

On July 3, 2013, Ceco filed a lawsuit against the Plan in the District of Colorado, seeking an order confirming the arbitrator's award under 29 U.S.C. § 1401(b)(2). *Ceco I*, 75 F. Supp. 3d at 1330. The Plan counterclaimed, asking the court to vacate the arbitrator's award. *Id.* at 1332.

Ceco and the Plan filed cross-motions for summary judgment. *Id.* at 1330. The district court affirmed the arbitrator's award and ordered the Plan to reimburse Ceco for

-11-

the withdrawal liability payments. *Id.* at 1342-43. The court addressed three issues relevant to this appeal.

First, the court agreed with the arbitrator's legal conclusion that § 1383(b)(2) withdrawal liability applies only to entities under common control at the time the obligation to contribute to the pension plan ceases. *Id.* at 1336-39. Heico's acquisition of CFA and CFA's performance of covered work therefore did not trigger withdrawal liability for Ceco.

Second, the court concluded the arbitrator did not err in finding that Ceco and CFA were not a single employer under federal common law. *Id.* at 1339-40.

Third, the court denied Ceco's request for attorney fees under 29 U.S.C. § 1451(e). *Id.* at 1342.

On January 2, 2015, Ceco filed a motion for the court to reconsider its decision to deny attorney fees. The motion urged the court to award attorney fees under Federal Rule of Civil Procedure 54(d)(2) and costs under Rule 54(d)(1). *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Trust* (*Ceco II*), No. 13-CV-01749-RBJ, 2015 WL 3494116, at *1-3 (D. Colo. June 2, 2015).

On January 12, 2015, Ceco filed a motion to amend the judgment to specify (1) judgment is entered against both the Trust and the Board, and (2) the amount of the judgment against the Trust, including the amount of interest accrued prior to January 1, 2015. *Id.* at *3-4.

On June 2, 2015, the district court granted the motion to amend the judgment and

denied the motion to reconsider the judgment as it related to attorney fees. *Id.* at *6. The court did, however, award costs to Ceco under Rule 54. *Id.* The district court entered an amended judgment the same day clarifying that judgment was entered against both the Board and the Trust.

## II.  DISCUSSION

On appeal, the Plan argues the district court erred by concluding (1) § 1383(b)(2) withdrawal liability applies only to entities under common control on the date the obligation to contribute ceases, and (2) Ceco and CFA are not alter egos or a single employer under federal common law.

Ceco also appeals, contending the district court erred in declining to award attorney fees in the June 2, 2015 order denying the motion to reconsider.

We reverse because the district court erred by limiting withdrawal liability to entities under common control at the time the obligation to contribute ceases.  We hold the plain language of § 1301(b)(1)'s definition of "employer" and § 1383(b)(2)'s definition of a construction-industry "complete withdrawal" allows a pension plan to assert withdrawal liability against any entity under common control on the day the common-control group triggers a § 1383(b)(2) withdrawal by continuing or resuming covered work.  The Plan was therefore authorized to assess withdrawal liability against Ceco because CFA became part of the common-control group and resumed the same work as Ceco within the five-year period under the statute.  We also remand with instructions to vacate the district court's award of costs to Ceco because Ceco is no

-13-

longer the prevailing party.

Because we conclude the Plan prevails on its statutory argument, we need not resolve the merits of its federal common law argument.

### A. *Withdrawal Liability Under § 1383(b)(2)*

We first address whether § 1383(b)(2) withdrawal liability may be assessed based on CFA's covered work that occurred after Heico's October 1, 2010 acquisition of CFA. The answer turns on whether the common-control group's composition must be determined on the date the contributing employer ceases its obligation to contribute or on the date the common-control group triggers withdrawal liability by resuming covered work.

### 1. **Standard of Review**

On this issue, the district court made a legal conclusion based on stipulated facts. We review the legal conclusion de novo. *Trustees of Colo. Pipe Indus. Pension Trust v. Howard Elec. & Mech. Inc.*, 909 F.2d 1379, 1382 (10th Cir. 1990).

### 2. **Statutory Interpretation**

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the language is plain and unambiguous, "our inquiry must cease and the plain meaning of the statute controls." *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1225 (10th Cir. 2014) (citations and quotations omitted). "The plainness or ambiguity of

-14-

statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341.

3. **Additional Legal Background**

Liability under the MPPAA hinges on whether a contributing employer has withdrawn from the pension plan. Section 1381(a) states, "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." The statute provides definitions of "complete" and "partial" withdrawal applicable to most employers, as well as specific definitions of "withdrawal" applicable to the construction, entertainment, trucking, moving, and warehousing industries. The § 1383(b)(2) construction-industry complete withdrawal applies here.

a. *Section 1383(b)(2) construction-industry complete withdrawal*

Section 1383 provides the general definition of "complete withdrawal" and also provides a narrower definition of "withdrawal" applicable to the construction industry.

Section 1383(a) defines "complete withdrawal." It states:

(a) Determinative factors

For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—

> (1) permanently ceases to have an obligation to contribute under the plan, or

> (2) permanently ceases all covered operations under the plan.

-15-

Section 1383(b)(2) defines a construction-industry complete withdrawal. It states:

> (2) A withdrawal occurs under this paragraph if—
>
>> (A) an employer ceases to have an obligation to contribute under the plan, and
>>
>> (B) the employer—
>>
>>> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>>>
>>> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

We refer to "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" as "covered work." A common-control group "continues to perform [covered] work" under the statute if it carries on its operation without interruption after the obligation to contribute ceases. *Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 830 (7th Cir. 1996). A common-control group "resumes such work" if it performs covered work after an interruption but within five years after the cessation. *Id.* As we explain below, this case turns on the "resumes such work" provision.

-16-

b.  *Definition of "employer"*

The term "employer" is used throughout the MPPAA, including in § 1383(b)(2). In short, "employer" means a common-control group.  Section 1301(b)(1) states, "For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."[5]  Among other things, a common 80 percent ownership creates common control.  26 U.S.C §§414(c), 1563.

Section 1301(b)(1)'s definition of "employer" has been construed broadly to "extend[] beyond the business entity withdrawing from the pension fund, thus imposing liability on related entities within the definition, which, in effect, pierces the corporate veil and disregards formal business structures."  *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 138 (1st Cir. 2013).[6]

---

[5] The "single employer" definition in § 1301(b)(1) is distinct from the single-employer doctrine under federal labor law, which determines whether multiple entities should be considered a single employer by applying the *Knowlton* factors.  *See* 189 F.3d at 1184.

[6] *See also Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 877 (7th Cir. 2013) ("When an employer participates in a multiemployer pension plan and then withdraws from the plan with unpaid liabilities, federal law can pierce corporate veils and impose liability on owners and related businesses."); *Corbett*, 124 F.3d at 86 (stating "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another"); *UNITE Nat. Ret. Fund v. Veranda Mktg. Co.*, No. 04 Civ. 9869 (BSJ), 2009 WL 2025163, at *4 (S.D.N.Y. July 13, 2009) (stating "when

Continued . . .

"[I]f a withdrawing employer is unable to pay in full, a pension plan can recover the deficiency jointly and severally from any other trade or business under common control with the withdrawing employer." *Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC*, 760 F.3d 745, 747 (7th Cir. 2014).

4. **Analysis**

The parties stipulate that CFA resumed covered work within five years of the May 1, 2010 cessation. But CFA was not under common control with Heico or Ceco on May 1, 2010. The question before us is whether the Plan can impose withdrawal liability against Ceco as a result of CFA's resumed work.

Both the district court and the arbitrator concluded that only parties under common control on the date of cessation could incur withdrawal liability under § 1383(b)(2). We disagree and hold that § 1383(b)(2) withdrawal liability may be assessed against all entities in the common-control group at the time of continuation or resumption of covered work. The Plan was thus permitted to assess withdrawal liability against Ceco because Ceco was under common control with CFA when CFA resumed covered work.

We arrive at this conclusion for five reasons. First, § 1301(b)(1)'s definition of "employer" applies to § 1383(b)(2). Second, § 1301(b)(1)'s definition of "employer" includes present and future compositions of the common-control group. Third, the plain

_____

Cont.

withdrawal liability is imposed on an employer, all other commonly controlled trades or businesses are liable as well").

-18-

language of § 1383(b)(2) in conjunction with § 1301(b)(1) indicates the common control must be determined when the common-control group triggers a withdrawal, which occurs when covered work resumes within five years of ceasing to contribute to the pension plan. Fourth, the "date of complete withdrawal" as defined in § 1383(e) is different than the date on which a common-control group triggers a withdrawal. Fifth, the foregoing reasons are consistent with the purpose of the MPPAA and the common-control rule.

a. *Section 1301(b)(1)'s definition of "employer" applies*

We first address whether § 1301(b)(1)'s definition of "employer" applies. Ceco argues §1301(b)(1) does not apply. Instead, it points to the definition of "obligation to contribute" in § 1392(a) and argues the term "employer" in § 1383(b)(2) refers to only the entity that had an obligation to contribute. Aplee. Br. at 31-32. Ceco thus asserts § 1383(b)(2) refers to Ceco but to no other entity in the control group. *Id.* We disagree.

By its plain terms, § 1301(b)(1) applies to subchapter III of ERISA.[7] Both §§ 1301 and 1383 appear in subchapter III. It therefore follows that § 1301(b)(1)'s definition of "employer" applies to § 1383(b)(2). Courts agree § 1301(b)(1) applies to § 1383(b)(2).[8] And Ceco points to no contrary statutory language or authority.

---

[7] Section 1301(b)(1) appears in subchapter III and states, "*For purposes of this subchapter*, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." (emphasis added).

[8] *See, e.g.*, *Sun Capital Partners III*, 724 F.3d at 138 (referring to § 1301(b)(1) as
Continued . . .

b. *Section 1301(b)(1)'s definition of "employer" is broad*

The MPPAA provides a broad definition of "employer."  29 U.S.C. § 1301(b)(1); *PBGC v. Anthony Co.*, 542 F. Supp. 43, 45 (N.D. Ill. 1982) (stating "the definition of 'employer' in Section 1301(b)(1) was expressed in broad form").  The broad definition pierces the corporate veil and allows courts to hold liable all entities under common control.  *See, e.g.*, *Sun Capital Partners III*, 724 F.3d at 138; *Messina Prods.*, 706 F.3d at 877.

The statute defines "employer" in the present and future tenses, not in the past tense.  *See* 1 U.S.C. § 1 (stating "words used in the present tense include the future as well as the present"); *United States v. Husted*, 545 F.3d 1240, 1243-44 (10th Cir. 2008) ("The Act uses the present tense ('travels'), which according to ordinary English grammar, does not refer to travel that has already occurred.").

The reference to an "employer" in its present or future forms indicates an employer—or, a common-control group—is not static.  Put differently, an employer

_____

Cont.

the MPPAA's "broad definition of 'employer'"); *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 120 (4th Cir. 1991) ("The MPPAA's definition of an 'employer' encompasses not merely the entity making contributions to the pension plan, but all trades and businesses that are under common control along with that entity." (quotations omitted)); *Trustees of Amalgamated Ins. Fund v. Saltz*, 760 F. Supp. 55, 56 (S.D.N.Y. 1991) ("For the purposes of ERISA and the MPPAA, the term 'employer' is defined to include all 'trades or businesses' which are controlled in common with the actual employing entity . . . .").

under § 1301(b)(1) is a group of trades or businesses under common control, and its composition can change over time as trades or businesses come in and out of common control. When a trade or business comes under common control, it becomes part of the employer and is treated as such for purposes of the MPPAA. A pension plan can then impose withdrawal liability against the new entity. *See Sun Capital Partners III*, 724 F.3d at 138.

c. *The plain language of §§ 1301(b)(1) and 1383(b)(2) indicates common control must be determined when the common-control group triggers withdrawal liability*

The MPPAA's plain language indicates common control must be determined at the time the group resumes covered work—not at the time of cessation. The MPPAA defines different types of withdrawal. Relevant here are (1) the § 1383(a) complete withdrawal, which applies to most employers, and (2) the § 1383(b)(2) construction-industry complete withdrawal. The provisions defining these types of withdrawals are materially different.

As noted above, under § 1383(a), a complete withdrawal occurs when an employer permanently ceases its obligation to contribute. Under § 1383(b)(2), however, a construction-industry complete withdrawal does not occur when the employer ceases its obligation to contribute: it occurs only if the employer (i.e., the common-control group) ceases its obligation and either continues or resumes covered work within five years. And if withdrawal occurs for either of these reasons, the employer (i.e., common-control group) must make withdrawal liability payments.

A § 1383(b)(2) withdrawal can therefore occur at any time in the five years after the employer ceases its obligation to contribute.  This means a plan must continue to evaluate a common-control group's operations within the five-year period to determine whether a withdrawal occurs.  And any entity under common control when withdrawal actually happens—meaning on the date the covered work resumes—can be held liable under § 1383(b)(2).

Section 1301(b)(1)'s broad definition of "employer" compels this conclusion.  A construction-industry common-control group's composition may change between the date the obligation to contribute ceases and the date the covered work resumes.  Even if new entities join the common-control group, the group remains the "employer" for purposes of § 1383(b)(2).

The timing of a § 1383(b)(2) withdrawal and § 1301(b)(1)'s broad definition of "employer" thus indicate the composition of the common-control group must be determined when an employer triggers withdrawal.  In this sense, withdrawal liability under §§ 1383(a) and 1383(b)(2) is consistent in that liability attaches only when an employer causes a withdrawal.  The distinction between the two is that the standard to determine what causes a withdrawal differs.

    d. *The date a common-control group triggers withdrawal liability is distinct from the "date of complete withdrawal" defined in § 1383(e)*

Section 1383(e) is entitled "Date of Complete Withdrawal" and states:  "For purposes of this part, the date of a complete withdrawal is the date of the cessation of the

-22-

obligation to contribute or the cessation of covered operations." Ceco argues this provision supports its position that the composition of the construction-industry common-control group must be determined on the date of cessation. Aplee. Br. at 34-35. But this argument confuses two distinct occurrences in the construction-industry context— (1) cessation and (2) the other necessary cause of withdrawal liability (i.e., continuation or resumption).

Section 1383(e) applies both to §§ 1383(a) and 1383(b) employers, and provides that cessation determines the date of complete withdrawal. For a § 1383(a) employer, cessation causes withdrawal liability *and* determines the date of complete withdrawal. For a § 1383(b) construction employer, cessation determines the date of complete withdrawal, but cessation alone does not cause withdrawal liability—continuation or resumption of covered operations must occur as well. Indeed, a construction employer may cease its obligation and completely avoid withdrawal liability by refraining from covered work for five years.

The date that a construction employer's covered operations continue or resume following cessation is the date on which withdrawal liability is actually triggered. And that is the date, as we have shown above, under the plain language of §§ 1301(b)(1) and 1383(b)(2), the common-control determination must be made.

By designating the date of cessation as the date of complete withdrawal for §§ 1383(a) and 1383(b) employers, the statute provides guidance to determine how much an employer must pay for withdrawal liability. This understanding is consistent with

-23-

§ 1391, which sets the amount of liability based on the employer's contributions up to the last day of the calendar year preceding the date of complete withdrawal (as defined by § 1383(e)). The "date of complete withdrawal" is therefore "instrumental in determining the amount of the employer's withdrawal liability." *Board of Trustees of Constr. Laborers Pension Trust for Southern California v. Thibodo*, 34 F.3d 914, 915 (9th Cir. 1994); *see also Milwaukee Brewery*, 513 U.S. at 418-19 (stating § 1391 calculates liability as of the year preceding the date of withdrawal); *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 337 (3d Cir. 2007) (same). And it serves as a necessary marker in the construction-industry context because a common-control group can trigger § 1383(b)(2) liability up to five years after cessation. If the triggering event happened years after cessation, there would be no contributions in the prior year on which to base calculations.

At bottom, §§ 1383(e) and 1391 instruct how to calculate the amount of liability. The date that matters for the common-control determination, however, is the date the group triggers withdrawal liability.[9]

_____

[9] A number of federal courts have held that withdrawal liability must be assessed only against entities under common control on the date of the withdrawal. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 881 (7th Cir. 2011) ("Our task is to determine whether common control existed on . . . the date [the employer] incurred withdrawal liability . . . ."); *UFCW Local One Pension Fund v. Enivel Properties, LLC*, No. 6:11-CV-1144 GTS/ATB, 2014 WL 2711660, at *6 (N.D.N.Y. June 16, 2014) (stating common control "is determined as of the date of the employer's withdrawal from the pension fund"); *Teamsters Pension Trust Fund of Philadelphia v. Brigadier Leasing Assocs.*, 880 F. Supp. 388, 396 (E.D. Pa. 1995)

Continued . . .

e. *The purpose of the MPPAA and the common-control rule indicates the common control must be determined when the group triggers withdrawal liability*

Our interpretation follows the text and also advances the primary purpose of the MPPAA and § 1301(b)(1)'s definition of "employer." *Cf. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 310, 313 (2006) (favoring interpretation that reflected the statute's plain language and defined purpose).

The purpose of the MPPAA is to protect pension beneficiaries from the adverse effects of employer withdrawals. *Milwaukee Brewery*, 513 U.S. at 417. The purpose of § 1301(b)(1)'s definition of "employer" "is to prevent a business subject to an unfulfilled pension debt from 'fractionalizing its operations' or shifting assets to related companies to avoid meeting its financial obligations to the plan." *Cent. States, Se. & Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993); *see also Mason & Dixon Tank Lines, Inc. v. Cent. States, Se.& Sw. Areas Pension Fund*, 852 F.2d 156, 159 (6th Cir. 1988) ("[T]he primary purpose of the common control provision is to ensure that employers will not circumvent their ERISA and MPPAA obligations by operating

_____
Cont.

("Withdrawal liability is imposed only on those trades and businesses that are under common control with the withdrawing employer on the date of withdrawal.").
    But none of these cases addressed a § 1383(b)(2) construction-industry withdrawal. The parties have not cited and we are unaware of any case that holds the common-control determination for a § 1383(b)(2) construction-industry complete withdrawal relates back to the cessation of the obligation to contribute.

-25-

through separate entities."). The rule "reflect[s] a congressional concern that the realities of business organization should prevail over the formalities of corporate structure." *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 636 F. Supp. 641, 659 (N.D. Ill. 1986) (quotations omitted).

Determining common control at the time the obligation to contribute ceases would provide an end run around § 1383(b)(2) withdrawal liability. Like the common-control group here, a group could avoid liability by terminating its obligation to contribute and then acquiring a nonunion business that resumes covered work. The common-control group would then escape any liability because the newly acquired entity would not have been under common control on the date of cessation. This would run contrary to the MPPAA's aim of protecting pension funds from the adverse effects of employer withdrawals and of imposing withdrawal liability on common-control groups regardless of corporate form.

Moreover, determining common control at cessation, as Ceco wishes, would lock each commonly controlled entity in to the group for purposes of future withdrawal liability, regardless of the group's composition at the time it triggers withdrawal. If an entity had left a common-control group shortly after cessation, it would still be on the hook for withdrawal liability if a remaining member of the group resumed covered work within five years. This would impose a heavy burden by requiring the entity that had left the common-control group to pay withdrawal liability despite its absence from the group when covered work resumed.

In sum, our interpretation advances the statute's purpose.

\* \* \* \*

The district court erred by limiting liability to the entities under common control at the time Ceco ceased its obligation to contribute. Heico and Ceco were under common control and were the "employer" on May 1, 2010 when Ceco terminated its obligation to contribute. Heico, Ceco, and CFA came under common control and were the "employer" after the October 1, 2010 acquisition. And they were under common control when CFA performed covered work. Although the common-control group's composition changed between Ceco's cessation and CFA's resumption of covered work, its identity did not change for purposes of § 1301(b)(1). When CFA resumed covered work, § 1383(b)(2) withdrawal occurred. The Plan properly assessed liability against Ceco because Ceco was part of the common-control group when withdrawal actually occurred—that is, when CFA performed covered work, well within the five-year resumption period.

B. *Liability Under the Single-Employer and Alter Ego Theories*

The Plan's second argument is that Ceco and CFA should be considered a single employer or alter egos under federal common law. The single-employer and alter ego tests do not rise out of the MPPAA. Rather, they are a product of National Labor Relations Board adjudicative decisions and federal common law. *See, e.g.*, *Broad. Serv. of Mobile*, 380 U.S. at 256; *Lockard*, 162 F.3d at 1069; *Evans*, 936 F.2d at 1089; *Connors Steel Co.*, 855 F.2d at 1506. Because we conclude the Plan may assess withdrawal liability under the governing statute, we need not determine whether Ceco and CFA are a

-27-

single employer or alter egos under federal common law.

## C. *Attorney Costs and Fees*

In light of our conclusion, we remand with instructions to vacate the district court's award of costs to Ceco because Ceco is no longer the prevailing party. For the same reason, we do not reach Ceco's arguments related to attorney fees.

## III. **CONCLUSION**

We reverse and remand with instructions to vacate the award of costs.