**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GCIU-EMPLOYER RETIREMENT
FUND; BOARD OF TRUSTEES OF THE
GCUI-EMPLOYER RETIREMENT
FUND,

     Plaintiffs - Appellants,

v.

COLERIDGE FINE ARTS; JELNIKI
LIMITED,

     Defendants - Appellees.

No. 19-3161
(D.C. No. 2:14-CV-02303-EFM-KGG)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **McHUGH**, Circuit Judges.
_____

This is the second time this case has been before this court. In each instance, a

dismissal for lack of personal jurisdiction was at issue. In this appeal, Plaintiffs

GCIU-Employer Retirement Fund and the Board of Trustees of the GCIU-Employer

Retirement Fund (collectively the "Fund") appeal from a second order dismissing

their action against Defendants Coleridge Fine Arts ("Coleridge") and Jelniki

Limited ("Jelniki"). The Fund alleges that Coleridge and Jelniki are jointly and

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

severally liable for certain pension payments under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). *Id.* §§ 1381–1461. Before reaching any issue of potential liability, the district court first had to determine whether Coleridge and Jelniki – both foreign corporations with controlling interests in an American company called Greystone Graphics, Inc. ("Greystone") – are subject to personal jurisdiction in the United States. The district court concluded personal jurisdiction was not established and granted a motion to dismiss. In the prior appeal, we agreed that the facts then presented did not support the exercise of personal jurisdiction over Coleridge and Jelniki, but we reversed and remanded for jurisdictional discovery. *GCIU-Emp'r Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 867–71 (10th Cir. 2017) (unpublished).

On remand, after the parties conducted further discovery, Coleridge and Jelniki again moved to dismiss on jurisdictional grounds. The district court granted the motion, concluding the additional evidence generated by the Fund did not establish that (1) Coleridge and Jelniki were involved in Greystone's day-to-day operations; or (2) the Fund's claims arose out of or related to Coleridge's and Jelniki's contacts with the United States. We affirm the district court's second dismissal for a lack of personal jurisdiction. We conclude that the Fund did not make a prima facie showing of purposefully-directed activities by Coleridge and Jelniki in connection with Greystone's withdrawal from the pension fund. We also conclude that the Fund forfeited any argument its injuries arose out of Coleridge's and Jelniki's alleged

2

contacts with the United States. Given these conclusions, we need not proceed to also consider whether exercising personal jurisdiction over Coleridge and Jelniki would be consistent with fair play and substantial justice.

## I

Multi-employer pension plans are regulated by ERISA, with the goal of protecting anticipated retirement benefits when such plans terminate "before sufficient funds have been accumulated[.]" *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1252 (10th Cir. 2016) (brackets added). To prevent employers from pulling out to "avoid paying for any shortfalls" upon termination, Congress amended ERISA by enacting the MPPAA. *Id.* at 1252–53. The MPPAA imposes "withdrawal liability" on any employer that has an obligation to contribute but withdraws from the plan. 29 U.S.C. § 1381(a). An obligation to contribute may arise under "one or more collective bargaining (or related) agreements[.]" *Id.* § 1392(a)(1) (brackets added). A "complete withdrawal" occurs when an employer "permanently ceases to have an obligation to contribute under the plan," or "permanently ceases all covered operations under the plan." *Id.* § 1383(a)(1)–(2); *see also Ceco*, 821 F.3d at 1253 (reiterating that "withdrawal liability arises when the employer stops its duty to contribute or ceases covered operations").

The MPPAA broadly defines "employer." The statute provides that all "trades or businesses (whether or not incorporated) which are under common control" shall be treated as "a single employer." 29 U.S.C. § 1301(b)(1). The law incorporates

3

Treasury regulations specifying that "common control" businesses include a "parent-subsidiary group" connected through "ownership of a controlling interest[.]" 26 C.F.R. § 1.414(c)-2(a)–(b) (brackets added). The statutory definition of "employer" thus "extend[s] beyond the business entity withdrawing from the pension fund," imposing liability on related entities "which, in effect, pierces the corporate veil and disregards formal business structures." *Ceco*, 821 F.3d at 1259 (brackets added, citation omitted). "[I]f a withdrawing employer is unable to pay in full, a pension plan can recover the deficiency jointly and severally from any other trade or business under common control with the withdrawing employer." *Id.* (brackets added, citation omitted).

According to the Fund's First Amended Complaint, the Fund receives contributions from several employers as a result of negotiated collective bargaining agreements ("CBAs") with certain local unions. App. at 100 ¶ 6. Greystone, a now defunct Kansas corporation, was one of the employers that previously contributed to the Fund pursuant to CBAs with the Graphic Communications International Union (the "Union"). *Id.* at 101, 103, 106 ¶¶ 11, 22, 44. Coleridge, an Irish company, became the 100% stockholder of Greystone in 2002. *Id.* at 100–02, 106 ¶¶ 8, 13, 20, 45. Jelniki, another Irish company, is the parent of Coleridge. *Id.* at 101, 106 ¶¶ 9–10, 14, 45. Greystone ceased doing business in 2011, effectuating a complete withdrawal from the Fund. *Id.* at 105 ¶ 39.

The Fund alleges that the 2011 withdrawal triggered shared liability for Coleridge and Jelniki, which were part of Greystone's common control group under

4

ERISA. *Id.* at 101–02, 107 ¶¶ 11, 21, 48. In 2013, the Fund obtained a default judgment against Greystone and its domestic "control group" entities. *Id.* at 106, 170–71 ¶ 41. The judgment imposed joint and several withdrawal liability upon those American companies in the amount of $4,454,092.02, but apparently the Fund has been unable to collect. *Id.* The Fund initiated this lawsuit in 2014, seeking to recover from Greystone's foreign "control group" entities – Coleridge and Jelniki. *Id.* at 2, 9–13. The Fund alleges Coleridge and Jelniki used Greystone to expand their operations in the United States. *Id.* at 105 ¶¶ 37–38.

The Fund also alleges that Greystone, Coleridge, and Jelniki had overlapping officers or directors. For example, Kevin Walsh served on the board of directors for Coleridge, Jelniki, and Greystone. *Id.* at 105–06 ¶¶ 34, 40. The Fund asserts that Eugene Reynolds, in addition to serving as a director for Coleridge and Jelniki, acted as President, Chief Executive Officer, and a board member for Greystone. *Id.* at 102, 105–06 ¶¶ 29, 40. The Fund maintains that Reynolds played an active role in negotiating one or more CBAs, pointing to (1) June 2007 correspondence on Greystone letterhead in which Reynolds urged the Union to accept a "Final" collective bargaining proposal; and (2) a March 2007 "Agreement" with the Union, signed by Reynolds and mentioning Greystone, to hold an "off the record" meeting to allow the Union to "communicate their concerns directly to the owner." *Id.* at 104, 142–43 ¶ 30. The Fund avers that, given the managerial positions he held with Greystone, Reynolds must have known about ERISA withdrawal liability as far back as 2007. That same year an actuary hired by Greystone indicated he was looking into

5

the issue because it could impact Greystone's business planning.  *Id.* at 103 ¶ 26. Reynolds additionally signed a 1994 CBA between the Union and a predecessor to Greystone.  *Id.* at 104, 144–69 ¶ 32.

Claiming a lack of personal jurisdiction, Coleridge and Jelniki moved to dismiss the First Amended Complaint.  *Id.* at 180–89.  The district court granted the motion.  *Id.* at 292–310.  On appeal, we agreed that the facts set forth in the parties' pleadings, affidavits, and exhibits were insufficient to establish minimum contacts consistent with due process.  *GCIU*, 700 F. App'x at 868–71.  However, because we concluded that the Fund was entitled to discovery on the issue of day-to-day involvement as a potential route to establish minimum contacts, we reversed and remanded for further proceedings.  *Id.* at 871; *see also id.* ("On remand, the district court shall permit jurisdictional discovery of material relating to the question of whether Coleridge and Jelniki, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone.").

We made the following observations in the first appeal.  We agreed with the Seventh Circuit that the "MPPAA's control group provision regarding withdrawal liability" does not alter the rule that "stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact."  *Id.* at 869 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943–45 (7th Cir. 2000)).  We assumed *arguendo* that Reynolds served on multiple boards and actively participated in the day-to-day management of Greystone, but found this activity lacking because there were "no credible allegations

6

Mr. Reynolds routinely acted on behalf of Coleridge and Jelniki when he discharged any of his duties as an officer and director of Greystone." *Id.* at 870. We added that the Fund's First Amended Complaint failed to allege any involvement by Reynolds in the actuary's 2007 decision to solicit withdrawal liability information from the Fund, let alone any actuarial involvement by Reynolds "in his capacity as an owner or director of Coleridge or Jelniki." *Id.*

To round out our discussion of minimum contacts in the first appeal, we commented that Reynolds's involvement in the negotiation of the 2007 CBA presented "a slightly closer question." *Id.* We determined that the June 2007 correspondence on Greystone letterhead provided "no support" for the proposition that Reynolds "was acting on behalf of either Coleridge or Jelniki during the negotiations." *Id.* We said that the March 2007 Agreement was ambiguous because the phrase "the owner" could conceivably refer to Coleridge. *Id.* at 870–71. Still, we concluded that one meeting between the Union and Reynolds (purportedly acting on behalf of Coleridge) was insufficient on the facts presented to support the exercise of specific jurisdiction. *Id.* at 871.

We further addressed in the first appeal the Fund's reliance on *Pension Benefit Guaranty Corp. v. Asahi Tec Corp.*, 839 F. Supp. 2d 118 (D.D.C. 2012), a case in which a district court denied a foreign parent company's motion to dismiss ERISA claims premised on termination liability because, *inter alia*, (1) the parent acquired its United States subsidiary with knowledge of the subsidiary's pension liabilities; and (2) the parent's "status" as a member of the "control group," which arose at the

time of the acquisition, was the basis for the plaintiff's claim. *Id.* at 120–21, 124–26.[1] We stated that even if we were "inclined to give any weight" to *Asahi Tec*, the facts in *GCIU* were "not comparable" because there was no proof of potential ERISA withdrawal liability at the time Coleridge acquired an initial stake in Greystone in 1998 and gained full control of Greystone in 2002. 700 F. App'x at 869. Because Greystone continued to contribute to the Fund until early 2011, the withdrawal liability giving rise to the Fund's claims against Coleridge and Jelniki manifested "thirteen years after Coleridge acquired a fifty percent ownership in Greystone and nine years after it acquired the remaining fifty percent interest." *Id.*

On remand, the parties conducted jurisdictional discovery. As a result of this discovery, the Fund identifies these additional material facts:

- *The Greystone-Coleridge corporate relationship.* Greystone's facility in Kansas City, Kansas was the property of United States companies under the umbrella of a wholly-owned Coleridge subsidiary. App. at 392–93. Three or four times, Greystone purchased some printing supplies for Coleridge that were unavailable in Ireland. *Id.* at 386–87. In 2000, Coleridge provided a $250,000 loan to Greystone, which Greystone did not repay. *Id.* at 389–91, 400–01.

---

[1] Following similar logic, the District of Columbia district court later granted a motion for summary judgment for the plaintiff, reaffirming that the foreign parent company was subject to personal jurisdiction in the United States. *Pension Benefit Guar. Corp. v. Asahi Tec Corp.*, 979 F. Supp. 2d 46, 56–64 (D.D.C. 2013).

- *Trips by board members to the United States.* James Lloyd, a member of Greystone's board and the Chief Financial Officer ("CFO") and General Manager of Greystone, met with Reynolds several times a year. *Id.* at 371–72, 375–77. Lloyd also met with Walsh on occasion. *Id.* at 377–78. Greystone did not pay travel expenses when Reynolds and Walsh came to visit from Ireland. *Id.* at 380. For example, Walsh visited Greystone in Kansas City four times from 1998 to 2005 "on behalf of Coleridge," and Coleridge paid his travel expenses. *Id.* at 402–06, 408.

- *Reynolds's involvement in Greystone matters.* Reynolds was involved in an "advisory capacity" in approving Greystone's CBAs, and occasionally made a brief appearance at the beginning of a negotiating session with the Union. *Id.* at 381, 384–85. Reynolds discussed withdrawal liability with Lloyd during 2006-2007 negotiations with the Union. *Id.* at 383. Reynolds also discussed certain hiring issues with Lloyd. *Id.* at 394–95. Reynolds at times used Coleridge telephones to communicate with Lloyd, and Reynolds was involved in the "winding down" of Greystone. *Id.* at 419, 428.

- *The 2007 Union-related documents signed by Reynolds.* As regards the meeting contemplated by the March 2007 Agreement between Greystone and the Union, Reynolds was described as "[r]epresenting the owners." *Id.* at 422–24. The June 2007 Greystone letter to the Union Reynolds signed was drafted by someone else after contract negotiations had broken down. *Id.* at 425–26.

9

At the close of discovery, Coleridge and Jelniki again sought dismissal for lack of personal jurisdiction. *Id.* at 431–54. The district court granted Coleridge's and Jelniki's motion. *Id.* at 501–15. The district court found that the Reynolds-Walsh contacts proffered by the Fund were "superficial" and did not demonstrate "day-to-day involvement in Greystone's business." *Id.* at 510–11, 513–14. The district court noted the absence of "credible evidence that any actions Reynolds took when he discharged his duties as an officer of Greystone were on behalf of Coleridge and/or Jelniki," and observed there was no proof the meeting referenced in the March 2007 Agreement "ever happened." *Id.* at 512–14. The district court likewise found that Coleridge's ownership of Greystone's building, Greystone's sporadic supply purchases, and Coleridge's $250,000 loan were consistent with a conventional parent-subsidiary relationship and demonstrated no day-to-day involvement. *Id.* at 511–12. Finally, the district court saw no evidence that the Fund's alleged injury arose out of the contacts identified and relied on by the Fund. *Id.* at 514.

## II

"We review de novo the district court's dismissal for lack of personal jurisdiction." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1074 (10th Cir. 2004) (citation omitted). When challenged, "the plaintiff has the burden of proving jurisdiction exists." *Id.* (citation omitted). When a district court "grants a pre-trial motion to dismiss without conducting an evidentiary hearing," this court "accepts as true the uncontroverted factual allegations in the complaint." *GCIU*, 700 F. App'x at 867. A plaintiff in these circumstances need only make a "prima facie showing" that

10

jurisdiction is proper, *id.*, and we "resolve all factual disputes in favor of the plaintiff[.]" *Benton*, 375 F.3d at 1074 (citation omitted).

"When a plaintiff's claims arise under federal law and the defendant is not subject to the jurisdiction of any state's court of general jurisdiction," Federal Rule of Civil Procedure ("Rule") 4(k)(2) "provides for federal long-arm jurisdiction if the plaintiff can show that the exercise of jurisdiction comports with due process." *GCIU*, 700 F. App'x at 867–68. As we have already determined that Rule 4(k)(2) applies here, the pivotal question is "whether the exercise of federal jurisdiction satisfies Fifth Amendment due process standards." *Id.* at 868. Consistent with the traditional "minimum contacts" requirement, "a federal court may exercise specific jurisdiction over a foreign defendant if the defendant purposefully directed its activities at the forum and the plaintiff's injuries arose from the defendant's forum-related activities." *Id.* The Fund relies on specific jurisdiction, not general jurisdiction, to assert claims against Coleridge and Jelniki.

## A

After the first appeal, the Fund had an opportunity on remand to investigate whether Coleridge and Jelniki were "involved in the day-to-day management of Greystone." *GCIU*, 700 F. App'x at 869–71; *see also Good v. Fuji Fire & Marine Ins. Co.*, 271 F. App'x 756, 759 (10th Cir. 2008) (unpublished) ("For purposes of personal jurisdiction, a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.") (citation and internal quotation marks

11

omitted). The Fund has not generated proof of this type of involvement by the parent entities. As to post-remand evidence regarding the Greystone-Coleridge corporate relationship, the Fund does not cite persuasive authority demonstrating that Greystone's intermittent purchases of supplies or Coleridge's alleged ownership (through other United States subsidiaries) of Greystone's building constitutes day-to-day management. The same is true of the $250,000 loan Coleridge made to Greystone. *Cf. Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1363–64 (10th Cir. 1974) (indicating that "parent financing of the subsidiary will not make the subsidiary a mere instrumentality").

That these Greystone-Coleridge connections fail to establish "day-to-day control" becomes even clearer when the contacts are viewed in the context of other uncontested facts. Coleridge and Jelniki were not registered and did not conduct business in Greystone's former home state of Kansas. App. at 456 ¶ 4. Coleridge and Jelniki did not have United States employees. *Id.* at 479. Coleridge and Jelniki did not send equipment, supplies, or printing products to Greystone. *Id.* at 484. Coleridge and Jelniki had separate budgets, payroll, and business records from Greystone. App. at 456 ¶ 6. Coleridge and Jelniki filed taxes separately from Greystone. *Id.* at 474 ¶ 2. Lloyd, as CFO and General Manager, was responsible for running Greystone. *Id.* at 492, 495. He oversaw the accounting, set financial projections, approved expenses, led Greystone management team meetings, and made decisions about production and marketing issues. *Id.* at 463, 465, 494. Lloyd communicated with Reynolds, but did not need Reynolds's approval for hiring

12

decisions, *id.* at 485–86.  *Cf. United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998)

(observing generally that neither "acts incident to the legal status of stockholders"

nor "duplication of some or all of the directors or executive officers" will render a

parent responsible for the wrongdoing of a subsidiary) (citation omitted).

Similarly inadequate is the Fund's post-remand evidence relating to trips by

board members to the United States and Reynolds's involvement in certain Greystone

matters.  Even assuming that Reynolds communicated and met with Lloyd several

times a year, that Walsh met with Lloyd four times over approximately eight years

"on behalf of Coleridge," and that Greystone did not pay for all of Reynolds's trips or

any of Walsh's trips,[2] those communications and meetings fall short of establishing

day-to-day management:

> Exercise of some degree of supervision by a 100% stockholder is not
> sufficient to render the subsidiary its instrumentality or alter ego.  That
> a stockholder should show concern about the company's affairs, ask for
> reports, sometimes consult with its officers, give advice, and even
> object to proposed action is but the natural outcome of a
> relationship. . . . Such participation in a subsidiary's affairs does not
> amount to the domination of day to day business decisions and disregard
> of the corporate entity necessary to impose liability on a parent.

*Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1264 (10th Cir.

1989) (citations and internal quotation marks omitted, interpreting Colorado law); *see*

*also Quarles*, 504 F.2d at 1363–64 (reaching a similar conclusion while applying

---

[2] At this stage, we must resolve in the Fund's favor any dispute about whether
Greystone paid for Reynolds's trips.  Reynolds testified that Greystone paid for his
flights, apartment, and car in connection with excursions to Kansas City.  App. at
481.  Lloyd testified that Greystone did not pay Reynolds's travel expenses.  *Id.* at
380.

Kansas law). The Fund's proof – especially in light of the additional undisputed facts described in the preceding paragraph – does not show that Reynolds and Walsh through their visits and interactions micromanaged Greystone's operations, even if one or both of those individuals were acting on Coleridge's or Jelniki's behalf.

The Fund's final category of post-remand evidence concerns CBA negotiations with the Union. This evidence does not establish day-to-day management of the CBA process, much less day-to-day management of Greystone as a whole. Assuming for the sake of argument that travel payments by one or more parent entities meant Reynolds was acting on behalf of Coleridge or Jelniki when he sent the June 2007 Union correspondence, that letter hardly represents extensive intervention. The March 2007 Agreement and the Fund's other Union-related items of proof do not establish day-to-day control either. Lloyd had the ultimate authority to approve a contract with the Union. App. at 467, 493. Reynolds's appearances at Union negotiating sessions were brief, typically to "say hello" to the participants, and the only substantive statements Reynolds made before leaving the sessions were to the effect of "listen to what [the] management team [is] saying." *Id.* at 468 (brackets added). The meeting contemplated by the March 2007 Agreement was "not a negotiation session," and there is no evidence this meeting actually took place. *Id.* at 143, 483.

**B**

Although the evidence offered by the Fund stops short of establishing day-to-day control of Greystone by Coleridge or Jelniki, we emphasized in the first appeal

14

that the test for liability is not necessarily coterminous with the test for personal jurisdiction. *See GCIU*, 700 F. App'x at 869–70 ("[T]he fact that a defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised.") (brackets added, citation and internal quotation marks omitted). Accordingly, we are also bound to consider the customary markers for personal jurisdiction: "(1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice." *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013). Even if we examine Coleridge's and Jelniki's nationwide contacts, *see Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211–13 (10th Cir. 2000) (concluding in a federal question case involving domestic defendants that due process "requires something more" than "minimum contacts with the United States as a whole"), the first two prerequisites have not been met, making it unnecessary to address the third.

**1**

The "purposeful direction" requirement can appear in different guises. "In the tort context, we often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). "In all events, the

15

shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Here, purposeful direction is missing, regardless of which test is applied.

The tort standard for purposeful direction often traces back to *Calder v. Jones*, 465 U.S. 783 (1984). We have interpreted *Calder* to require an "intentional" action, "expressly aimed" at the forum state, with "knowledge that the brunt of the injury" would be felt in that forum. *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1280 (10th Cir. 2016) (citation omitted). "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.*

The Fund has not satisfied this criterion. The injury to the Fund is based on the alleged failure of Coleridge and Jelniki to make pension payments under ERISA after Greystone's withdrawal in 2011. We noted in our prior opinion a lack of proof "that any withdrawal liability actually or even potentially existed" when Coleridge and Jelniki ostensibly joined Greystone's "control group" by acquiring 50% of Greystone in 1998 or 100% of Greystone in 2002. *GCIU*, 700 F. App'x at 869. We thus rejected the Fund's argument that Coleridge or Jelniki "purposefully directed its activities at the forum" when it obtained a controlling interest in Greystone. *Id.* The

16

Fund's post-remand evidence regarding ownership of Greystone's building, the extension of a loan to Greystone in 2000, occasional trips to the forum by board members on Coleridge's dime, and Reynolds's marginal involvement with CBAs in 2007 or earlier does not fill this gap. Put another way, none of the Fund's proof shows that Coleridge or Jelniki intentionally aimed its conduct at the forum knowing that these activities would produce pension-related injuries there.

The contract standard for purposeful direction incorporates *Burger King*, 471 U.S. 462. There, the Supreme Court held that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," should be evaluated "in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479; *accord Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1298 (10th Cir. 1999). Parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (citation and internal quotation marks omitted). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Although the "purposeful direction" question in the matter at hand is closer using the contract test versus the tort test, the answer is the same. Coleridge and

17

Jelniki secured a controlling interest in Greystone, a United States company, but we expressly rejected the argument in the first appeal that "the acquisition of a company that participates in a multiemployer pension plan is, by itself, sufficient to establish personal jurisdiction over the acquiring company[.]" *GCIU*, 700 F. App'x at 869 (brackets added); *see also id.* (citing *Shaffer v. Heitner*, 433 U.S. 186, 213–16 (1977) for the proposition that due process requires more than just an ownership interest in an entity located in the forum). The details of any acquisition agreements between Greystone, Coleridge, and Jelniki have not been explored on appeal, including whether any share purchase transactions referenced withdrawal liability under ERISA. *Cf. Burger King*, 471 U.S. at 480 (noting, *inter alia*, that the defendant "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in the forum state, including contractual statements relevant to the underlying claims that operations would be conducted and supervised from, notices and payments would be sent to, and agreements would be made in and enforced from the forum). While the Fund's post-remand evidence certainly suggests an ongoing relationship between Coleridge, Jelniki, and Greystone (as one would expect between a parent and a subsidiary) it does not connect any purposeful availment to Greystone's cessation of pension payments, the event giving rise to this lawsuit. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.,* 137 S. Ct. 1773, 1780 (2017) (confirming that specific jurisdiction

"is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction") (citation omitted).[3]

**2**

We look next at the second marker for personal jurisdiction: whether "the litigation results from alleged injuries that arise out of or relate to" a defendant's activities purposefully directed at the forum. *Burger King*, 471 U.S. at 472–73 (citation and internal quotation marks omitted); *accord Monge v. RG Petro-Machinery (Grp.) Co.*, 701 F.3d 598, 613–14 (10th Cir. 2012). "Some courts have interpreted the phrase 'arise out of' as endorsing a theory of 'but-for' causation, while other courts have required proximate cause to support the exercise of specific jurisdiction." *Dudnikov*, 514 F.3d at 1078 (citations omitted). But-for causation means "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Id.* "[C]onsiderably more restrictive" is proximate causation, which turns on "whether

---

[3] The Supreme Court explained in *Bristol-Myers Squibb* that "since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." 137 S. Ct. at 1783–84. Because no party in the case at bar draws any distinction between the Fifth and Fourteenth Amendments with respect to the "purposeful direction" and "arising out of" requirements, we assume without deciding that these restrictions are the same under either Amendment. *Cf. Peay*, 205 F.3d at 1212 ("The Due Process Clauses of the Fourteenth and Fifth Amendments are virtually identical, and both were designed to protect individual liberties from the same types of government infringement.") (citation, internal quotation marks, and footnote omitted).

any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Id.* (citation omitted).

The causation requirement was highlighted both by this court in the first appeal and by the district court on remand. We generally noted that "the plaintiff's injuries" must "ar[i]se from the defendant's forum-related activities," *GCIU*, 700 F. App'x at 868 (brackets added), and specifically stated that a 2007 meeting involving Reynolds was insufficient "to support the exercise of specific jurisdiction, particularly when the Fund has not alleged how its injuries arose from that meeting." *Id.* at 871. In its second dismissal order, the district court echoed that "the plaintiff's injuries [must have arisen] from the defendant's forum-related activities," App. at 514 (brackets in original), held that the Fund's injuries "arose because Greystone went out of business and withdrew from the fund," and saw no evidence that these harms "arose from Reynolds' and Walsh's limited contacts (on behalf of Coleridge and Jelniki) with the United States." *Id.*

In its opening brief in this appeal, however, the Fund did not address the extent to which its injuries arose out of purposefully-directed activities of Coleridge and Jelniki. The phrase "arising out of or relating to" does not appear in the Fund's issue headings, and the Fund did not present an organized "causation" argument in its initial brief. Aplt. Br. at i–ii, 13–30. By these omissions, the Fund forfeits any challenge to the district court's ruling on this ground. *See Rivero v. Bd. of Regents*, 950 F.3d 754, 763 (10th Cir. 2020) ("If the district court states multiple alternative grounds for its ruling and the appellant does not challenge all these grounds in the

20

opening brief, then we may affirm the ruling."); *United States ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1250 (10th Cir. 2017) (determining that appellants waived their argument "by failing to raise it in their opening brief").[4] This problem cannot be remedied by arguments about the "arising out of" requirement raised for the first time in the Fund's reply brief. *See Sandoval v. Unum Life Ins. Co. of Am.*, --- F.3d ----, 2020 WL 1265671, at *6 n.4 (10th Cir. 2020) ("Unum does raise this argument in the reply brief, but this was too late."); *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019) (same).

In sum, we need not decide whether but-for or proximate causation is necessary, because the Fund in its opening brief did not meaningfully address the "arising out of" requirement. The district court invoked this requirement in its dismissal order. The Fund expressly grappled with the issue only after Coleridge and Jelniki raised it in their response brief. Aple. Br. at iii, 19–21; Aplt. Reply Br. at i, 8–10. That response by the Fund comes too late. We must uphold the district court's unchallenged ruling on causation.

## C

The Fund's remaining argument is that this case is materially similar to *Asahi Tec*, 839 F. Supp. 2d at 120, 124–25, where a federal court in the District of

---

[4] Similarly insufficient are any passing and undeveloped references in the Fund's initial brief to causation (*e.g.*, Aplt. Br. at 15). *See Anderson Living Trust v. Energen Res. Corp.*, 886 F.3d 826, 831 n.6 (10th Cir. 2018) (reasoning that appellants who identify an issue in an opening brief "but otherwise fail to develop it, providing no argument or legal authority to support it," remain subject to waiver).

21

Columbia exercised personal jurisdiction over a parent company charged with a subsidiary's termination liability under ERISA. We explained why this dispute differs from *Asahi Tec* in our prior opinion. *GCIU*, 700 F. App'x at 868–69. In any event, the Fund has forfeited this contention as well. Coleridge and Jelniki point out that the Fund did not argue to the district court on remand that *Asahi Tec* (based on facts developed after the first appeal) was controlling. Aple. Br. at 22. The Fund offers no response in its reply brief. Aplt. Reply Br. at ii, 1–19; *see also* App. at 333–60 (setting forth the contents of the Fund's post-remand brief to the district court, without reference to *Asahi Tec*). The Fund's abandonment of *Asahi Tec* in the district court obviates the need for us to now address it on appeal. *See Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1266 n.3 (10th Cir. 2020) ("Generally, this court does not consider arguments raised for the first time on appeal.").

## III

We affirm the district court's dismissal of the Fund's claims against Coleridge and Jelniki for lack of personal jurisdiction.

Entered for the Court


Mary Beck Briscoe
Circuit Judge