FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 6, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

BP AMERICA PRODUCTION
COMPANY,

     Plaintiff-Appellant,

vs.

DEBRA ANNE HAALAND, in her
official capacity as United States
Department of Interior Secretary;
KIMBRA DAVIS, in her official
capacity as Office of Natural
Resources Revenue Director,

     Defendants-Appellees.

No. 22-8024

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:21-CV-00105-NDF)**

_____

Sarah Y. Dicharry of Jones Walker, LLP, New Orleans, Louisiana (Jonathan A.
Hunter of Jones Walker, LLP; and Hadassah M. Reimer of Holland & Hart
LLP, Jackson, Wyoming, with her on the brief), for Plaintiff-Appellant.

Justin D. Heminger (Todd Kim with him on the brief), of United States
Department of Justice, Environment and Natural Resources Division, for
Defendants-Appellees.

_____

Before **PHILLIPS**, **BALDOCK**, and **McHUGH**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

BP America Production Company asks us to adopt its interpretation of the Federal Oil and Gas Royalty Simplification and Fairness Act, which would shield it from paying the government nearly $700,000 in correctly assessed royalty underpayments. In doing so, BP has abandoned the sole argument it presented to the agency—that the agency had erred about the effective date of BP's lease transfers. Instead, BP now argues that the royalty-payment statute compels reversal of all individual royalty underpayments less than $10,000, despite those underpayments being correctly calculated and assessed. We reject BP's statutory interpretation and affirm the district court's order upholding the agency order requiring BP to pay.

## BACKGROUND

### I.    Legislative Background

In response to the "archaic and inadequate" accounting of lease royalties by the Department of the Interior, 30 U.S.C. § 1701(a)(2), Congress passed the Federal Oil and Gas Royalty Management Act of 1982, codified at 30 U.S.C. §§ 1701–1759. The Royalty Management Act tasked the Secretary of the Interior with creating an internal system for managing royalties on federal oil and gas leases. *Id.* § 1701(b)(2). Congress mandated that the Secretary "establish a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties." *Id.* § 1711(a). Congress also permitted the Secretary to delegate responsibility to "conduct inspections, audits, and

2

investigations . . . to any State with respect to all Federal land within the State." *Id.* § 1735(a); *see id.* § 1732(a).

The newly established Minerals Management Service (MMS) assumed responsibility for the collection, distribution, and auditing of royalties on federal leases. S. Rep. No. 104-260, at 13 (1996). But MMS proved more malady than cure; it often took up to twelve years to complete audits of production royalties. *Id.* at 14.

In 1996, still faced with a revenue-collection system clogged by lengthy audits and appeals, Congress amended the Royalty Management Act as part of its enactment of the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (RSFA), Pub. L. No. 104-185, 110 Stat. 1700. Among other things, the RSFA streamlined the audit and appeals processes for royalty disputes. S. Rep. No. 104-260, at 14. For instance, Congress imposed a seven-year statute of limitations on all royalty disputes, barring judicial proceedings or demands outside the limitations period. 30 U.S.C. § 1724(b)(1). And further, Congress limited the Secretary (or the Secretary's designee) to 33 months in which to issue final decisions on any appealed royalty dispute after an appeal's commencement, *id.* § 1724(h)(1); otherwise, she would be "deemed" to have approved a final decision either affirming the agency for a monetary obligation of more than $10,000 or reversing it for a monetary obligation of $10,000 or less, *id.* § 1724(h)(2).

3

In 2010, the Department restructured the MMS into three separate offices, including the Office of Natural Resources Revenue (ONRR). *Reorganization of Title 30, Code of Federal Regulations*, 75 Fed. Reg. 61,051, 61,052 (Oct. 4, 2010). Taking the MMS's place, the ONRR's duties included determining, collecting, and auditing royalties for federal oil and gas leases. 30 C.F.R. § 1201.100. The ONRR also became the first level of appeal for royalty payors disputing adverse decisions from a State order. *See id.* § 1290.105.

If dissatisfied with the ONRR Director's decision, royalty payors may appeal to the Department of the Interior's Board of Land Appeals (IBLA). *Id.* § 1290.108; 43 C.F.R. § 4.1(b)(2). The Secretary has delegated to the IBLA the authority to make final decisions on various matters, including "[t]he use and disposition of public lands and their resources." 43 C.F.R. § 4.1(b)(2)(i). The IBLA's Chief Administrative Judge is authorized to delegate an appeal to a panel of two or more administrative judges and to communicate final decisions on the IBLA's and the Secretary's behalf.[1] *Id.* § 4.2(a), (c).

## II.    Factual Background

Between 2008 and 2012, BP held more than twenty federal leases in the Jonah Field, one of the largest natural-gas deposits in the United States.

---

[1] Because the IBLA acts on the Secretary's behalf, we refer to the IBLA and the Secretary interchangeably in our discussion.

Located on federal land in the Upper Green River Basin of west central Wyoming, the Jonah Field is managed by the BLM, a subagency of the United States Department of the Interior.

Sometime in early 2012, BP conveyed the record title, operating rights, and royalty obligations for its Jonah Field leases to Linn Energy Holdings, LLC. In the applicants' signature block for each lease transfer form, BP and Linn Energy marked the date as June 25, 2012, and declared, as between themselves, the transfer to be "EFFECTIVE as of the 1st of April, 2012." *E.g.*, App. at 170. For unstated reasons, BP and Linn Energy delayed in filing the necessary forms with the BLM to provide the BLM notice of the transfers and seek the BLM's necessary approval. *See* 43 C.F.R. § 3106.4-1. After the necessary filings, the BLM approved the transfers. For royalty-payment purposes, the BLM set effective dates of October 1, 2012, for the transfers filed in September, and of November 1, 2012, for the transfers filed in October. *See id.* § 3106.7-4.

On August 28, 2012, the State of Wyoming's Mineral Audit Division of its Department of Audit began auditing BP's federal royalty payments for the Jonah Field between 2008 and 2011. At BP's request, in June 2014 the State expanded its audit to include calendar year 2012, so that the audit would cover the periods after BP transferred the leases to Linn Energy. In March and April 2016, the State notified BP of its audit findings that BP owed underpayments of

more than $6.5 million for years 2008 to 2011 and more than $2.4 million for 2012.

In May 2016, BP objected to the State's 2012 audit results, contending that the "total royalty amount should be reduced . . . to a total royalty under payment of *$1,912,993.63*." Supp. App. at 6. The State agreed to reduce the 2012 royalty underpayment to $2,023,436.71, and BP began to pay it.

But on September 27, 2016, BP changed course, advising the State that BP would no longer pay any of the royalty underpayments assessed for April to October 2012. BP claimed that Linn Energy (which had declared bankruptcy in May 2016) should be "responsible for the remaining months" because "the properties were sold to Linn with an effective date of April 2012." App. at 148. BP did not dispute the methodology or calculation of the royalty underpayment for April to October 2012.

By December 2016, BP completed payment of its royalty underpayments for 2008 to March 2012, but it continued to withhold the remaining $1,031,377.23 in underpayments for April to October 2012.

### III.    Procedural Background

#### A.    The State's Order

On March 1, 2017, the State of Wyoming's Mineral Audit Division ordered BP to pay the remaining royalty underpayments and rejected BP's position that the transfer to Linn Energy took effect on April 1, 2012, before the BLM was notified of and approved the transfers. The State ruled that BP

6

remained liable for the royalty underpayments from April to October 2012

because the BLM had not approved BP's transfer to Linn Energy until

November 1, 2012:

> Until BLM approves the lease assignment or lease transfer, BP continues to be responsible for the lease obligations. The effective date on the payor of record or operating rights BLM form signifies when BP is released from their obligation. The additional royalty due is $1,031,377.23 for April 2012 through October 2012.

App. at 148. As its legal bases, the State relied on the RSFA and BLM's

implementing regulations.[2]

The State's order attached numbered enclosures, including a summary

schedule of the royalties owed by BP, which the parties call "Enclosure 6."

Enclosure 6 listed the individual royalty underpayments (by lease number,

product, and month), which the State totaled as $1,031,377.23. Most of these

individual royalty underpayments were less than $10,000.

## B.    The ONRR Proceedings

In June 2017, BP appealed the State's order to the ONRR. *See* 30 C.F.R.

§ 1290.105(a)(1). Notably, BP did not challenge the State's aggregation of the

---

[2] Assigning or subletting oil and gas leases requires the Secretary's approval. 30 U.S.C. §§ 187, 187a. "[A]ny assignment or sublease shall take effect as of the first day of the lease month following the date of filing in the proper land office" and "until such approval, . . . the assignor . . . shall continue to be responsible for the performance of any and all obligations." *Id.* § 187a; *see also* 43 C.F.R. §§ 3106.1(b), 3106.7-2, 3106.7-4. Such obligations include the payment of royalties on oil and gas production. 30 U.S.C. §§ 1702(25)(B)(ii)(I), 1712(a).

individually assessed royalty obligations (into a single monetary obligation of $1,031,377.23). BP instead made four other arguments. *First*, BP repeated its challenge to all royalty underpayments from April to October 2012 on grounds that the BLM had "approved the assignments without modification" and so had adopted BP's suggested effective date. App. at 177. *Second*, BP contended that during the rulemaking process for 43 C.F.R. § 3106.7-2, which governs assignors' continuing royalty obligations, the BLM had assured stakeholders that this regulation would not apply to the determination of liability for production royalties. BP argued that the State's enforcing § 3106.7-2 would violate the notice requirements of the Administrative Procedure Act (APA), because the State had taken a position in the order contrary to the BLM's position in the rulemaking process.[3] *Third*, BP argued that the State's order should at least be modified to exclude royalties after September 2012 because the transfers to Linn Energy were effective on October 1, 2012, making Linn Energy primarily responsible for those royalties. *Fourth*, BP argued that the State's order unlawfully required it to perform a restructured accounting. *See* 30 U.S.C. § 1724(d)(4)(B)(i) (explaining when "repeated, systemic reporting errors" trigger an order to perform a restructured accounting).

---

[3] In its appeal to the district court, BP abandoned its notice-based rulemaking challenge to 43 C.F.R. § 3106.7-2.

On September 30, 2020, the ONRR Director issued a decision. First, the Director rejected BP's position that April 1, 2012, was the effective lease-transfer date for royalty purposes. The Director noted that both 30 U.S.C. § 187a and 43 C.F.R. § 3106.7-4 establish that "the submitted assignment or transfer request, if approved, takes effect on the first day of the month following the date of its filing in the proper BLM office." App. at 194. The Director further noted that BP's transfer forms do not even provide a space for assignors or transferors to insert effective assignment dates. Instead, "the only place on either form to set the effective date is expressly reserved 'FOR BLM USE ONLY.'" *Id*. So, the Director ruled, "the 'effective date' that the [BLM] examiner placed on each Request Form controls over the date that BP suggested."[4] App. at 195.

Second, the Director rejected BP's argument that the State's order violates the APA. As mentioned, BP contended that the BLM had told commenters during the rulemaking process that 43 C.F.R. § 3106.7-2's continuing-liability requirements would not apply to production royalties. The Director cited the BLM's response to public comments on 43 C.F.R. § 3106.7-2 to show that BP indeed had notice of the State's position: "A commenter

---

[4] The ONRR Director also rejected BP's argument that its transfer forms created binding contracts with the United States, noting that BLM personnel lacked "actual authority to bind the government to a contract, much less to bind the government to terms different than those found in 30 U.S.C. § 187a and 43 C.F.R. § 3106.7-4." App. at 195 n.31.

suggested that we recognize the terms of assignment agreements that specify which responsibilities are assigned or transferred. The final rule did not adopt this suggestion because we cannot be bound by agreements to which we are not a party." App. at 198 (quoting *Oil and Gas Leasing: Onshore Oil and Gas Operations*, 66 Fed. Reg. 1883, 1889 (Jan. 10, 2001)).

Third, observing that "BP identifies no calculation error" in Enclosure 6, the Director focused on the primary issue BP presented to the ONRR—the effective date of the transfers of BP's Jonah Field leases. App. at 199. Relying on 30 U.S.C. § 1712(a), the Director concluded as follows:

- BP is primarily liable for royalties due for the production months April 2012 through September 2012, on the 21 Leases where it transferred its operating rights to Linn effective October 1, 2012. . . .

- BP is primarily liable for royalties due for the production months April 2012 through October 2012, on the two Leases where BP transferred its operating rights to Linn Energy effective November 1, 2012. . . .

- BP is secondarily liable for royalties due for production months April 2012 through October 2012, on the four Leases where BP assigned its record title to Linn effective November 1, 2012.

App. at 199–200.

The Director granted in part BP's argument that the State had erred by including some royalty obligations "related to a Lease or production month

where BP was not a lessee," thus reducing BP's monetary obligation to $905,348.24.[5] *Id.* at 200.

Fourth, the Director concluded that the State's order did not require BP to perform a restructured accounting, finding no record or statutory support for BP's argument. The Director affirmed the State's order "as amended," and concluded that "BP must report and pay $905,348.24 in additional royalties no later than 30 days after its receipt of this decision." *Id.* at 203.

### C.    The IBLA Proceedings

On October 21, 2020, BP appealed the ONRR Director's decision to the IBLA. Under 30 U.S.C. § 1724(h)(1), if the Secretary of the Interior opts to "issue a final decision in any administrative proceeding," she must do so "within 33 months from the date such proceeding was commenced," unless both parties agree to extend the deadline. The parties jointly agreed to extend the 33-month statutory period to December 2, 2020, and in doing so reminded the IBLA that if the Secretary opted not to issue a decision by then, that the Secretary "shall be deemed to have issued a final decision" and BP "shall have a right to judicial review of [that] deemed final decision." Supp. App. at 13–14 (quoting 30 U.S.C. § 1724(h)(2)(B)).

---

[5] As part of the Director's decision, the ONRR prepared "Amended Enclosure 6," which detailed the Jonah Field lease obligations by lease and month. App. at 205.

11

On December 2, 2020, citing § 1724(h)(2)(B), the IBLA issued an order stating that "by operation of law, it will be deemed that the Secretary issues a final decision in favor of the Secretary affirming those issues for which the ONRR Director rendered a decision on September 30, 2020." Supp. App. at 16–17. In other words, the Secretary opted for a "deemed" final decision rather than issue her own written decision.

A week later, the IBLA issued another order, formally dismissing BP's appeal. The IBLA reiterated that "[b]y operation of law, the Secretary is deemed to have affirmed [the] ONRR Director's decision." *Id.* at 21.

## D.    The District Court Proceedings

BP timely appealed the IBLA's final agency action to the United States District Court for the District of Wyoming. For the first time, BP argued that the imposed $905,348.24 monetary obligation was really 443 individual monetary obligations. Under § 1724(h)(2)(A), BP argued that the Secretary's deemed final decision released BP from paying the 432 royalty-underpayment obligations that were less than $10,000. That would leave just 11 of the 443 listed royalty obligations—the 11 individual obligations that exceeded $10,000 and totaled $218,576.49. Thus, by BP's reckoning, it no longer owed $686,771.75 of the correctly assessed $905,348.24 royalty underpayments. According to BP, each of the 443 royalty obligations was a separate "monetary obligation." App. at 34.

12

Additionally, BP maintained its challenge to the effective date of its lease transfers, claiming that it owed no royalties from April to October 2012. BP argued that "[u]pon the effective date of BLM's approval of those assignments, Linn Energy owned the relevant lease interests and was bound to the terms of the leases, *dating back to April 1, 2012*, to the same extent as if Linn Energy were an original lessee." *Id.* at 46.

Finally, BP alternatively argued that the Secretary's "deemed" final decision under § 1724(h)(2) lacked a reasoned basis and thus violated the APA. As we understand this argument, BP contended that the Secretary's "silent" final decision (the deemed final decision) was a standalone decision, divorced from the ONRR Director's decision.

The district court rejected each of BP's arguments and affirmed the Secretary's "deemed" final agency decision. The court disagreed with BP that the Secretary's deemed final decision had, by operation of § 1724(h)(2)(A), reversed the IBLA's ruling that BP owed royalty underpayments for 432 of the IBLA's collectively assessed royalty obligations that were less than $10,000. Instead, the district court ruled under § 1724(h)(2)(B) that BP was liable for a single monetary obligation of $905,348.24. In the district court's words, "the issue decided by the Director was the effective date of BP's assignment" and "[a]s to that issue, the Director's decision resulted in a monetary obligation of $905,348.24." App. at 124. With one monetary obligation of $905,348.24, BP

13

had no monetary obligation less than $10,000 to avail itself of § 1724(h)(2)(A), or to challenge the district court's appellate jurisdiction under that subsection.

Next, the court addressed BP's "effective date" argument. Under the Mineral Leasing Act and its implementing regulations, 43 C.F.R. §§ 3106.7-2 and 3106.7-4, the court ruled that "BP's assignment of record title or transfer of operating rights for the leases took effect as of the first day of the lease month following the date of filing, which was either October 1, 2012, or November 1, 2012." *Id.* at 126–27. The district court agreed with the ONRR Director that "BP cannot change its statutory or regulatory obligations by any negotiations with a third party, or by altering the transfer forms to type in a different effective date for the transfer." *Id.* at 127.

BP has timely appealed. BP challenges the district court's total-monetary-obligation ruling, but, as mentioned, BP has abandoned its "effective date" argument, the sole issue it presented to the agency. So the issue before us is one that BP failed to alert the Secretary to before she decided whether a deemed final decision would suffice. If BP had so alerted the Secretary, she may well have issued a final written decision individually adjudicating each of the 443 royalty obligations, thus foreclosing BP's ability to seek relief from a deemed final decision under § 1724(h)(2)(A), the argument it now advances to us.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 to review BP's appeal of the district court's final affirmance of agency action. *Kansas ex rel. Kobach v. U.S. Dep't of Interior*, 72 F.4th 1107, 1124 (10th Cir. 2023). We also have jurisdiction to review final agency actions under the APA. 5 U.S.C. § 704; *see also* 30 U.S.C. § 1724(h)(2)(B) ("[T]he appellant shall have a right to judicial review of such deemed final decision in accordance with Title 5.").

## DISCUSSION

On appeal, BP asserts that the district court erred in two ways: (1) by reading "monetary obligation" as used in § 1724(h)(2)(A) and (B) to mean the aggregated monetary obligation of BP's individual royalty obligations totaling $905,348.24; and (2) by affirming the Secretary's so-called "silent" deemed final decision, allegedly lacking a reasoned basis as the APA requires.

Each party claims that "monetary obligation" is unambiguous in its favor. But we conclude that the term is ambiguous in contexts like this one, which involve multiple assessed royalty obligations, some more than $10,000, some less. In resolving this ambiguity, we examine related statutory language and then buttress our interpretation of those statutes by relying on the obvious congressional intent behind the RSFA.

We review de novo a district court's rulings on agency actions. *Kobach*, 72 F.4th at 1124. We owe no deference to the district court's decision and "render an independent decision using the same standard of review" as the

15

district court. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (citation omitted). And we will not disturb agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

I.     **Though the meaning of "monetary obligation" is ambiguous in BP's case, we resolve the ambiguity in the government's favor based on surrounding statutory language and expressed congressional intent.**

We begin by examining whether the language of § 1724(h)(2) has a "plain and unambiguous meaning with regard to the particular dispute in the case." *Ceco Concrete Const., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1258 (10th Cir. 2016) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). When interpreting a statute, "our primary task is to determine congressional intent, using traditional tools of statutory interpretation." *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (cleaned up). If "the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41 (1989); *see also Robinson*, 519 U.S. at 340.

To determine whether a statute is plain and unambiguous, we examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *see also Hamer v. City of Trinidad*, 924 F.3d 1093, 1103 (10th Cir. 2019) ("[T]he meaning of statutory language, plain or not, depends on context." (cleaned up)).

16

We also presume that Congress enacted sensible legislation that avoids unjust, impractical, or absurd outcomes. *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87 (1868); *see also Resol. Tr. Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 529–30 (10th Cir. 1991). When possible, we try to "give effect to each word" and only "reject words as surplusage if inadvertently inserted or if repugnant to the rest of the statute." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (cleaned up).

We turn now to the statute in question. As noted in its heading, § 1724(h) addresses "[a]ppeals and final agency action." It generally provides that "[d]emands or orders issued by the Secretary or a delegated State are subject to administrative appeal in accordance with the regulations of the Secretary." 30 U.S.C. § 1724(h)(1).

We consider § 1724(h)(2)'s disputed terms in full:

**(h) Appeals and final agency action**

. . . .

**(2)    Effect of failure to issue decision**

If no such decision has been issued by the Secretary within the 33-month period referred to in paragraph (1)—

**(A)**    the Secretary shall be deemed to have issued and granted a decision in favor of the appellant as to any nonmonetary obligation and any *monetary obligation* the principal amount of which is less than $10,000; and

**(B)**    the Secretary shall be deemed to have issued a final decision in favor of the

17

> Secretary, which decision shall be deemed to affirm those issues for which the agency rendered a decision prior to the end of such period, as to any *monetary obligation* the principal amount of which is $10,000 or more, and [BP] shall have a right to judicial review of such deemed final decision in accordance with Title 5.

*Id.* § 1724(h)(2)(A)–(B) (emphases added).

This appeal turns on the interpretation of the term "monetary obligation." For help interpreting this term, we lean on related statutory definitions in the Royalty Management Act. *See id.* § 1702. Though the Act does not define "monetary obligation," it does define "obligation" and "order to pay." *Id.* § 1702(25), (26). The Act allows obligors to pay oil or gas royalties either "in kind" or in money. *Id.* § 1702(25)(B). For those paying monetarily, the Act defines an "obligation" as "any duty of a lessee or its designee" to pay "monies including . . . the principal amount of any royalty . . . which arises from or relates to any lease administered by the Secretary" for production of "oil or gas on Federal lands." *Id.* § 1702(25)(B)(ii).

The Act then enforces collection of the monetary obligation through a written order:

> "[O]rder to pay" means a written order issued by the Secretary or the applicable delegated State to a lessee or its designee . . . which—
>
> **(A)**   asserts a specific, definite, and quantified obligation claimed to be due, and
>
> **(B)**   specifically identifies the obligation by lease, production month and monetary amount of such

> obligation claimed to be due and ordered to be paid[.]

*Id.* § 1702(26). As seen, an order to pay speaks to a single obligation, not multiple obligations. From that, we conclude that the monetary obligation in this case is the total amount ordered paid ($905,348.24)—not each of the 443 constituent royalty obligations.

Yet we see ambiguity. We acknowledge that the $905,348.24 ordered to be paid here—though a "specific, definite, and quantified" amount due—does not arise from a single lease, production month, and monetary amount. But we read the purpose of this "lease, production month and monetary amount" condition as providing the obligor with notice of the individual royalty obligations included in the monetary obligation, so the obligor can contest any obligations individually.

In Amended Enclosure 6, the ONRR Director provided BP this information. And with this itemization, BP could challenge—and the ONRR could review and reduce—the individual royalty underpayments by the effective date of BP's lease transfers.[6] Otherwise stated, § 1702(26) requires that the order to pay *identify* the subparts of an obligation, but it does not

---

[6] As BP notes, the ONRR Director's decision "affirmed the [State] Order with respect to the majority of the underlying royalty obligations but reversed the Order with respect to 'any royalty obligation related to a Lease or production month where BP was not a lessee.'" Reply Br. at 12 (quoting App. at 200). But this simply acknowledges that disputed royalty obligations are considered individually but ordered paid only when legally owed.

*define* those subparts as individual monetary obligations. Reading the statute BP's way might well require clogging the system with 443 separate orders to pay.[7]

We also acknowledge BP's point that ONRR regulations require separate reporting requirements for different oil and gas products, which must be broken down by lease, product, and month. *See* Op. Br. at 6–7 (citing 30 C.F.R. §§ 1202.101, 1202.151, 1202.152, 1210.53, 1218.50). But whatever BP's regulatory reporting requirements, they do not determine or define the "monetary obligation" as used in § 1724(h)(2)(A)–(B)'s deemed-final-decision rule. After all, a statutory provision governing judicial review serves a different purpose. *See Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 575–76 (2007) (stating that "[c]ontext counts" when interpreting the "same defined term in different provisions of the same statute").

Congressional intent reinforces our statutory interpretation. Congress enacted the RSFA largely to provide "faster audit, royalty collection and appeals processes" so that "moneys owed to the United States [are collected] in a shorter period of time." S. Rep. 104-260, at 13. The RSFA also streamlined the appeals process to effect "quicker resolution of money disputes between the

---

[7] At oral argument, BP asserted that "the Department of the Interior could have issued individual orders for each one of [the individual royalty obligations,] and then we'd be looking at . . . the principal amount for each individual royalty obligation for determining the $10,000 threshold." Oral Argument at 11:02–11:14.

United States and royalty payors." *Id.* BP's reading of the statute would frustrate this congressional intent by requiring the ONRR to rule individually on each royalty obligation less than $10,000—even if the debtor concedes owing the obligations. And if the Secretary overlooked issuing a final decision affirming all individual royalty obligations and not just their total—for instance, as with the $686,771.75 that BP agrees were correctly assessed—the government would lose that revenue as well as untold other revenue in like appeals. And all for no good reason. For us, it is obvious that Congress did not intend BP's requested result.

Finally, we read § 1724(h)(2)(A)'s "less than $10,000" demarcation as applying when the monetary obligation in the Order to Pay meets that condition. So, hypothetically, if a company challenged a single royalty obligation of less than $10,000 to the IBLA, or multiple royalty obligations totaling less than $10,000, and if the Secretary had opted for issuing a deemed final decision under the statute, the company would be relieved of its liability for those payments and have an enforceable right to relief under § 1724(h)(2)(A).

But BP didn't do that. Instead, it challenged its liability for the *collective* amount of those royalty obligations based on one issue—the "effective date" of the lease transfers. And because that issue determined BP's liability for all the outstanding royalty payments, the total "monetary obligation" implicated by

21

BP's appeal was $905,348.24, a sum well above the $10,000 statutory condition. Only once in federal court did BP unsheathe § 1724(h)(2)(A).

Based on our statutory interpretation, we affirm the district court's order holding BP liable for its monetary obligation of $905,348.24.

## II.    We agree with the BLM's regulatory interpretation of "monetary obligation."

Ordinarily, after concluding that "monetary obligation" in § 1724(h)(2) is ambiguous, we would consult and defer to the agency's interpretation of this term. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–44 (1984). But BP contends that we cannot defer here "because Section 1724(h) confers jurisdiction to the federal courts." Op. Br. at 19 (citing *Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*, 252 F.3d 473, 482 (D.C. Cir. 2001), *modified on denial of reh'g*, 270 F.3d 957 (D.C. Cir. 2001)). In so arguing, BP asserts that the statute's interpretation is "categorically not a matter of agency judgment." *Id.* (quoting *United States v. Fields*, 516 F.3d 923, 934 (10th Cir. 2008)). Though we see distinctions here from *Murphy*, we will assume without deciding that BP is correct, because the government has failed to brief this issue.[8] We leave the question for another day. So, we will not defer to the agency's interpretation in this appeal.

---

[8] In *Murphy*, the D.C. Circuit examined whether a refund request was an "administrative proceeding" within the meaning of 30 U.S.C. §1702(18), such that it would trigger § 1724(h)(1)'s 33-month period, the lapse of which would invoke the district court's appellate jurisdiction. 252 F.3d at 477, 480. The

*(footnote continued)*

Even so, for completeness, we take note of the regulation in passing. The BLM defines "monetary obligation" as "a lessee's . . . duty to pay, . . . any obligation in any order." 43 C.F.R. § 4.903. Further, it instructs how "[t]o determine the amount of any monetary obligation, for purposes of the default rule of decision in . . . 30 U.S.C. [§] 1724(h)":

(1)     If an order asserts a monetary obligation arising from one issue or type of underpayment that covers multiple leases or production months, the total obligation for all leases or production months involved constitutes a single monetary obligation; [and]

(2)     If an order asserts monetary obligations arising from different issues or types of underpayments for one or more leases, the obligations arising from each separate issue . . . constitute separate monetary obligations.

43 C.F.R. § 4.903.

Here, BP faces "a monetary obligation arising from *one issue or type of underpayment* that covers *multiple leases* or production months." *Id.* (emphases added). And the ONRR Director imposed a monetary obligation of $905,348.24 arising from *one* issue—the effective date of the Linn Energy transfers and BP's liability for the royalties—which covered multiple leases and production months. Though we rely on our own statutory interpretation and not 43 C.F.R.

---

issue in *Murphy* was clearly jurisdictional because the district court's interpretation of "administrative proceeding" directly determined the appellate-jurisdiction issue. *Id.* at 477.

§ 4.903, we note that the agency's interpretation of § 1724(h)(2) matches our own interpretation of the statute.

## III.    Section 1724(h)(2)(B) does not violate the APA.

Under § 1724(h)(2)(B), "the appellant shall have a right to judicial review of such deemed final decision in accordance with Title 5." We understand "Title 5" to refer to the judicial review provisions of the APA, 5 U.S.C. §§ 701–706. From this, BP takes a remarkable position on appeal. It argues that all "deemed" final decisions by the Secretary violate the APA, because these decisions are silent and "lack[] *any* articulated basis—let alone the 'reasoned' basis that decades of case law mandate for an agency decision to be upheld." Op. Br. at 37. Though in the district court BP treated the ONRR Director's decision as the agency's final decision, it now faults the district court for doing so.[9]

Changing tack, BP contends that nothing in § 1724(h)(2)(B) allows the Secretary to incorporate the ONRR Director's decision into her deemed final

---

[9] The government points out that in BP's petition for review in the district court, BP stated that "[t]he September 30, 2020, decision of the ONRR Director, deemed by operation of law to be Interior's final decision in BP's administrative appeal (*hereinafter* the 'Final Decision'), is attached hereto as Exhibit 1." Resp. Br. at 39 (quoting App. at 8). The government noted that BP challenged the Director's decision as the Secretary's deemed final decision and argued under the APA that it conflicted with the RSFA and the Mineral Leasing Act. In its Reply brief, BP responds to this "chid[ing]" by asserting that "in that filing BP explained that *Interior* was deemed to have issued a final decision affirming the Director's Decision, triggering BP's right to judicial review." Reply Br. at 23 n.28.

decision.[10] In doing so, BP ignores the key language from subsection (B): "the Secretary shall be deemed to have issued a final decision in favor of the Secretary, which decision shall be deemed *to affirm those issues for which the agency rendered a decision* prior to the end of such period[.]" 30 U.S.C. § 1724(h)(2)(B) (emphasis added). This language matters. It says that for appeals with a monetary obligation of $10,000 or more, the Secretary's deemed final decision adopts the ONRR Director's decision on the issues raised.[11] So we reject BP's argument that the Secretary's deemed final decision is "silent," Op. Br. at 40, and cannot be "the product of reasoned decisionmaking," *id.* at 38 (citing *Double J. Land & Cattle Co. v. U.S. Dep't of Interior*, 91 F.3d 1378, 1383 (10th Cir. 1996)).[12]

---

[10] In support, BP cites statutes that it says "elevate" an inferior agency decision as the final decision of the agency. Op. Br. at 39 n.125 (citing 29 U.S.C. §§ 3246(c), 1853(b)(2) and 20 U.S.C. § 1234a(g)). We acknowledge the difference in wording but not in result.

[11] In *OXY USA Inc. v. United States Department of the Interior*, we briefly noted that "[t]he Board did not issue a final merits decision prior to the 33-month limitations period," and so "[t]he [ONRR] Director's decision thus became the agency's final decision ripe for judicial review." 32 F.4th 1032, 1043 (10th Cir. 2022) (citing 30 U.S.C. § 1724(h)(1), (2)(B); 43 C.F.R. § 4.906(a)).

[12] In *Double J.*, we reversed after noting that the record from the IBLA proceedings was "devoid of facts supporting the conclusion that [the corporate officer], as an individual, [wa]s trespassing on federal land." 91 F.3d at 1383. In this case, the ONRR's record is robust and certainly not "silent" as in *Double J.*

25

As the district court noted, BP's APA "argument . . . would effectively nullify all deemed affirmed final decisions under the RSFA." App. at 125. By BP's logic, any such deemed final decision would fail APA review by not articulating a reasoned basis, or any basis at all. We agree with the government that BP's argument would require that Congress had "intentionally fashioned a circular, self-defeating process under which [the] RSFA first directs that the Secretary's deemed-final decision is reviewed under the APA, and the APA then directs that [the] Secretary's deemed-final decision fails review." Resp. Br. at 40.

## CONCLUSION

The district court's order is affirmed.

BALDOCK, J. concurs in the judgment only.

26